**Fred KOREMATSU, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. CR–27635 W.**

United States District Court, N.D. California.

April 19, 1984.

---

1408

William T. McGivern, Asst. U.S. Atty., San Francisco, Cal., Victor Stone, Counsel for Special & Appellate Matters, General Litigation & Legal Advice Section, U.S. Dept. of Justice, Washington, D.C., for defendant.

Dale Minami, Minami & Lew, San Francisco, Cal., Peter Irons, Leucadia, Cal., Robert L. Rusky, Hanson, Bridgett, Marcus, Vlahos & Stromberg, Ed Chen, Coblentz, Cahen, McCabe & Breyer, Eric Yamamoto, San Francisco, Cal., for plaintiff.

## OPINION

PATEL, District Judge.

Fred Korematsu is a native born citizen of the United States. He is of Japanese ancestry. On September 8, 1942 he was convicted in this court of being in a place from which all persons of Japanese ancestry were excluded pursuant to Civilian Exclusion Order No. 34 issued by Commanding General J.L. DeWitt. His conviction was affirmed. *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944).

Mr. Korematsu now brings this petition for a writ of *coram nobis* to vacate his conviction on the grounds of governmental misconduct. His allegations of misconduct are best understood against the background of events leading up to his conviction.

On December 8, 1941 the United States declared war on Japan.

Executive Order No. 9066 was issued on February 19, 1942 authorizing the Secretary of War and certain military commanders "to prescribe military areas from which any persons may be excluded as protection against espionage and sabotage."

Congress enacted § 97a of Title 18 of the United States Code, enforcing the exclusions promulgated under the Executive Order. Section 97a made it a misdemeanor for anyone to enter or remain in any restricted military zone contrary to the order of a military commander.

In the meantime, General DeWitt was designated Military Commander of the Western Defense Command which consisted of several western states including California.

On March 2, 1942 General DeWitt issued Public Proclamation No. 1 pursuant to Executive Order 9066. The proclamation stated that "the entire Pacific Coast ... is subject to espionage and acts of sabotage, thereby requiring the adoption of military measures necessary to establish safeguards against such enemy operations."

Thereafter, several other proclamations based upon the same justification were issued placing restrictions and requirements upon certain persons, including all persons of Japanese ancestry. As a result of these proclamations and Exclusion Order No. 34, providing that all persons of Japanese ancestry be excluded from an area specified as Military Area No. 1, petitioner, who lived in Area No. 1, could not leave the zone in which he resided and could not remain in the zone unless he were in an established "Assembly Center." Petitioner remained in the zone and did not go to the Center. He was charged and convicted of knowingly remaining in a proscribed area in violation of § 97a.

It was uncontroverted at the time of conviction that petitioner was loyal to the United States and had no dual allegiance to Japan. He had never left the United States. He was registered for the draft and willing to bear arms for the United States.

In his papers petitioner maintains that evidence was suppressed or destroyed in the proceedings that led to his conviction and its affirmance. He also makes substantial allegations of suppression and distortion of evidence which informed Executive Order No. 9066 and the Public Proclamations issued under it. While, the latter may be compelling, it is not for this court to rectify. However, the court is not powerless to correct its own records where a fraud has been worked upon it or where manifest injustice has been done.

The question before the court is not so much whether the conviction should be vacated as what is the appropriate ground for relief. A description of the procedural history of these proceedings explains this posture.

## PROCEDURAL HISTORY OF THESE PROCEEDINGS

Petitioner filed his petition for a writ of *coram nobis* on January 19, 1983. The first scheduled status conference was conducted on March 14, 1983, when all parties appeared before the court. At that time the petition was deemed a motion and the government was ordered to respond by August 29, 1983. Petitioner's reply to the government's response was set for September 26, 1983, and a hearing on the petition was scheduled for October 3, 1983. Informal discovery was conducted in accordance with the agreement arrived at during the conference. Thereafter, the government moved for an extension based upon the forthcoming report of the Commission on Wartime Relocation and Internment of Civilians ("Commission"), which it anticipated would have a substantial bearing on these proceedings. The motion for a continuance was opposed. The court granted the motion, giving the government until September 27, 1983 to respond, and setting October 25, 1983 for petitioner's reply and November 4 for a hearing on the petition. Thereafter, the government was given a further extension, to October 4, for the filing of its response. On October 4, 1983,

a document entitled "Government's Response and Motion Under L.R. 220–6" ("Response") was filed. The substance of the Response consists of less than four pages. In fact, it is not an opposition to the petition, but a counter-motion to vacate the conviction and dismiss the underlying indictment.[1] It is denominated a motion under Local Rule 220–6, pertaining to the hearing of related motions.

On October 31, petitioner filed his reply and Request for Judicial Notice. The government filed its Preliminary Response to the Request for Judicial Notice on November 7, 1983. A hearing on the petition and counter-motion was conducted on November 10, 1983.

Because the government maintains that the court should grant its motion and not reach the merits of the petition, the counter-motion is considered first.

## THE GOVERNMENT'S COUNTER-MOTION

■ The government does not specifically designate in its memorandum the grounds for its motion. It relies upon *Rinaldi v. United States*, 434 U.S. 22, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977) and *United States v. Hamm*, 659 F.2d 624, 631 (5th Cir.1981) (en banc), in which motions were made pursuant to Fed.R.Crim.P. 48(a). At the hearing the government acknowledged Rule 48(a) as the premise for its motion.

Rule 48(a) has its antecedents in the common law doctrine of *nolle prosequi*. An understanding of that doctrine is necessary to a discussion of the Rule's application here. As the literal translation of *nolle prosequi*—"I am unwilling to prosecute"— makes clear, the primary purpose of the doctrine was to allow the government to cease active prosecution. At common law, and before Rule 48(a) was enacted, prosecution was within the exclusive jurisdiction of the prosecuting attorney at the early stages of the proceedings and a *nolle prosequi* could be entered at any time before the jury was empaneled. *Confiscation*

---

1. Although the government referred in its papers to dismissal of the indictment, the defend-

ant was in fact convicted upon an information.

*Cases,* 74 U.S. (7 Wall.) 454, 457, 19 L.Ed. 196 (1868).

However, as the case progressed, the prosecuting attorney lost the unilateral right to enter a *nolle prosequi.* After the jury was sworn and evidence heard, the defendant had the right to object to the entry of a *nolle prosequi* and the effect of the entry at that stage was a verdict of acquittal. *United States v. Shoemaker,* 27 F.Cas. 1066 (C.C.D.Ill.1840) (No. 16,279). While the prosecutor's unilateral power to enter a *nolle prosequi* apparently revived just after the verdict was returned, once a sentence had been handed down or final judgment entered, that unilateral right of the prosecutor was again extinguished. *United States v. Brokaw,* 60 F.Supp. 100 (S.D.Ill.1945).

With the adoption of Rule 48(a), the absolute authority of the prosecutor was tempered and leave of court was required for dismissal of an indictment, information or complaint at *any* stage of the proceedings. Although there is a substantial body of case law dealing with the scope of the court's authority to grant or deny leave to dismiss, little has been written about the time within which a Rule 48(a) dismissal may be brought.

There is nothing to suggest that the Rule was intended to extend the *nolle prosequi* privilege beyond that allowed at common law. In fact, the purpose of the Rule was to place some fetters on prosecutorial discretion. Fed.R.Crim.P. 48(a) advisory committee note 1. The plain language of the section is also instructive. The Rule allows for dismissal, with leave, of an indictment, information or complaint, whereupon "the prosecution shall ... terminate." As the Rule provides that upon the court's approval of a *nolle prosequi,* the prosecution will terminate, it clearly contemplates action by the prosecuting agency only while control of the prosecution still lies, at least in part, with it. By contrast, the prosecutor has no authority to exercise his *nolle prosequi* prerogatives at common law or to invoke Rule 48(a) after a person has been subject to conviction, final judgment, imposition of sentence and exhaustion of all appeals and, indeed, after a lapse of many years. At

that stage, there is no longer any prosecution to be terminated.

*United States v. Weber,* 721 F.2d 266 (9th Cir.1983) does not compel a different interpretation. In *Weber,* as in the cases upon which it relies, the Rule 48(a) motion was made during the pendency of the proceedings. Applying the same rationale, that dismissal is a possibility while the case is still being actively prosecuted, the Supreme Court, even after it has granted a petition for a writ of certiorari, has remanded to allow the government to dismiss charges against the petitioner. *E.g., Watts v. United States,* 422 U.S. 1032, 95 S.Ct. 2648, 45 L.Ed.2d 688 (1975). This is because Rule 48(a) and the right of *nolle prosequi* emanate from the Executive's power to initiate a criminal prosecution and to terminate a pending prosecution. *See United States v. Cowan,* 524 F.2d 504, 507 (5th Cir.1975), *cert. denied sub nom. Woodruff v. United States,* 425 U.S. 971, 96 S.Ct. 2168, 48 L.Ed.2d 795 (1976) (citing *United States v. Cox,* 342 F.2d 167 (5th Cir.1965), *cert. denied sub nom. Cox v. Hauberg,* 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965)).

The court finds no authority for the proposition that a Rule 48(a) motion may be made long after the prosecution has come to rest, the judgment is final, appeals have been exhausted, judgment imposed and the sentence served.

THE PETITION FOR A WRIT OF CORAM NOBIS

A writ of *coram nobis* is an appropriate remedy by which the court can correct errors in criminal convictions where other remedies are not available. Although Rule 60(b), Fed.R.Civ.P., abolishes various common law writs, including the writ of *coram nobis* in civil cases, the writ still obtains in criminal proceedings where other relief is wanting. *United States v. Morgan,* 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954). *See also James v. United States,* 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 615 (1982) (dissenting opinion in denial of petition for writ of certiorari explaining purpose of *coram nobis* ); *Chres-*

**1412**

*field v. United States*, 381 F.Supp. 301, 302 (E.D.Pa.1974).

■ While the *habeas corpus* provisions of 28 U.S.C. § 2255 supplant most of the functions of *coram nobis*, particularly in light of the federal courts' expanded view of custody, *habeas corpus* is not an adequate remedy here. Petitioner's sentence has been served. He cannot meet the "in custody" requirements of § 2255 under any interpretation of that section. *See Hensley v. Municipal Court*, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973) (discussing meaning of custody in context of 28 U.S.C. § 2254 requirements); *Jones v. Cunningham*, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963) (finding the restraints of parole sufficient to constitute custody for the purposes of *habeas* proceedings under § 2254); *Azzone v. United States*, 341 F.2d 417 (8th Cir.1965), *cert. denied sub. nom. Azzone v. Tahash*, 390 U.S. 970, 88 S.Ct. 1090, 19 L.Ed.2d 1180 (1968) (applying the custody requirement in § 2255 proceedings). It is in these unusual circumstances that an extraordinary writ such as the writ of *coram nobis* is appropriate to correct fundamental errors and prevent injustice. *United States v. Correa-De Jesus*, 708 F.2d 1283 (7th Cir.1983).

■ The source of the court's power to grant *coram nobis* relief lies in the All Writs Act, 28 U.S.C. § 1651(a). The petition is appropriately heard by the district court in which the conviction was obtained. *Morgan*, 346 U.S. at 512, 74 S.Ct. at 253. This is so even though the judgment has been appealed and affirmed by the Supreme Court. Appellate leave is not required for a trial court to correct errors occurring before it. *Standard Oil of California v. United States*, 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976).

*Coram nobis* being the appropriate vehicle for petitioner to seek relief, I turn to the question of how the court shall proceed in this unusual case.

While the government would have this court grant its motion and look no further,

petitioner asks this court to look behind the conviction, view the "evidence" that has now come to light and make findings of fact. The court concludes that the first alternative, although easy, is not available; the second alternative is unnecessary.

■ Even were the government in a position to move under Rule 48(a) of the Fed.R.Crim.P., the court would not automatically grant dismissal. A limited review by the court is necessary, even where the defendant consents. The purpose of this limited review is to protect against prosecutorial impropriety or harassment of the defendant and to assure that the public interest is not disserved. *United States v. Cowan*, 524 F.2d at 512–13.[2]

■ This Circuit has resolved that petitions for a writ of *coram nobis* should be treated in a manner similar to § 2255 *habeas corpus* petitions. *United States v. Taylor*, 648 F.2d 565 (9th Cir.), *cert. denied*, 454 U.S. 866, 102 S.Ct. 329, 70 L.Ed.2d 168 (1981). Thus, the nature of the court's inquiry is substantially more expansive than under Rule 48(a). For example, § 2255 considerations apply in determining whether an evidentiary hearing is required. 648 F.2d at 573 n. 25.

■ In *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the Supreme Court provided instructions to the district courts as to when evidentiary hearings should be held in state *habeas* cases under 28 U.S.C. § 2254. It is clear that care must be taken and a hearing afforded when a palpable claim is raised by the petitioner and there is an inadequate record or disputed factual issues. However, the Court acknowledged that district courts have substantial discretion and should not be put to conducting unnecessary evidentiary hearings. The parties may choose to rely upon the record or an expanded record and forego an evidentiary hearing. The same standards apply in *habeas* proceedings under § 2255. *See Sosa v. United States*, 550 F.2d 244, 250–56 (5th Cir.1977) (separate opinion of Judge Tuttle and col-

**2.** Indeed, it has been suggested that Rule 48(a), Fed.R.Crim.P., "contemplates public exposure of the reasons for abandonment of an indictment,

information or complaint ...." *United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F.Supp. 483, 486 (S.D.N.Y.1964).

lected citations therein). And where "on the facts admitted, it may appear that, as matter of law, the prisoner is entitled to the writ" no hearing need be held. *Walker v. Johnston,* 312 U.S. 275, 284, 61 S.Ct. 574, 578, 85 L.Ed. 830 (1941).

 On a motion under § 2255, the government must establish that there is no genuine issue of material fact; the petitioner is entitled to the benefit of favorable inferences. *Honneus v. United States,* 509 F.Supp. 1135, 1138 (D.Mass.1981). Where, as here, the government offers no opposition and, in effect, joins in a similar request for relief, an expansive inquiry is not necessary. In fact, the government agrees petitioner is entitled to relief and concedes: "There is, therefore, no continuing reason in this setting for the court to convene hearings or make findings about petitioner's allegations of governmental wrongdoing in the 1940's." Response at 3. However, even where the government has acknowledged that the conviction should be set aside, albeit on different grounds, the court must conduct some review to determine whether there is support for the government's position.

 Ordinarily, in cases in which the government agrees that a conviction should be set aside, the government's position is made clear because it confesses error, calling to the court's attention the particular errors upon which the conviction was obtained. A confession of error is generally given great deference. Where that confession of error is made by the official having full authority for prosecution on behalf of the government it is entitled to even greater deference. *See Sibron v. State of New York,* 392 U.S. 40, 58–59, 88 S.Ct. 1889, 1900–1901, 20 L.Ed.2d 917 (1968). Even so, the court must conduct its own review. *Young v. United States,* 315 U.S. 257, 62 S.Ct. 510, 86 L.Ed. 832 (1942).

In this case, the government, joining in on a different procedural footing, is not prepared to confess error. Yet it has not submitted any opposition to the petition, although given ample opportunity to do so. Apparently the government would like this court to set aside the conviction without looking at the record in an effort to put this unfortunate episode in our country's history behind us.

The government has, however, while not confessing error, taken a position tantamount to a confession of error. It has eagerly moved to dismiss without acknowledging any specific reasons for dismissal other than that "there is no further usefulness to be served by conviction under a statute which has been soundly repudiated." (R.T. 13:20–22, November 10, 1983). In support of this statement, the government points out that in 1971, legislation was adopted requiring congressional action before an Executive Order such as Executive Order 9066 can ever be issued again; that in 1976, the statute under which petitioner was convicted was repealed; and that in 1976, all authority conferred by Executive Order 9066 was formally proclaimed terminated as of December 31, 1946. While these are compelling reasons for concluding that vacating the conviction is in the best interests of this petitioner, respondent and the public, the court declines the invitation of the government to treat this matter in the perfunctory and procedurally improper manner it has suggested.

On the other hand, this court agrees that it is not necessary to reopen the partially healed wounds of an earlier period in order to perform its role of conducting independent judicial review. Fortunately, there are few instances in our judicial history when courts have been called upon to undo such profound and publicly acknowledged injustice. Such extraordinary instances require extraordinary relief, and the court is not without power to redress its own errors.[3]

---

**3.** As discussed above, a full evidentiary hearing is not always required. Petitioner's submissions in this case would ordinarily justify a hearing and the court could not, in light of those submissions, deny the petition without affording a hearing. *See Lujan v. United States,* 424 F.2d 1053 (5th Cir.1970). However, it is clear from the results reached herein, that petitioner is not prejudiced by the failure to conduct an evidentiary hearing. The government is deemed to have waived its right to a hearing.

Because the government has not acknowledged specific errors, the court will look to the original record and the evidence now before it to determine whether there is support for the petition and whether manifest injustice would be done in letting the conviction stand.

EVIDENTIARY ISSUES

The "evidence" before this court consists of certain documents and reports of which petitioner asks the court to take judicial notice. The posture of this request is curious. In response to the request, the government filed a "Preliminary Response." This was filed three days before the hearing on the petition. In its "Preliminary Response," the government did not take issue with the merits of petitioner's request for judicial notice. Its response was merely "designed to convey our general objections" and the government offered to file a full response if requested by the court. It then went on to make further arguments in favor of its own motion. Again, this was on the eve of a hearing which had been postponed and for which the government had had ample opportunity to formulate a response. At the first hearing, as noted below, the question of judicial notice had been raised and discussed.

The matters which petitioner asks the court to judicially notice are the Report of the Commission on Wartime Relocation and Internment of Civilians, entitled *"Personal Justice Denied"* (Washington, D.C., 1982) ("Report") and certain government documents, the authenticity of which is not in dispute.

 When the parties are in agreement that the court may take judicial notice of certain matters, or that records may be admitted as public records, the court need not make as searching an inquiry as when notice or admissibility is disputed. Similar considerations apply here, as the government, rather than actually opposing the request and supplying reasons for such opposition, has merely suggested it may oppose the request. In fact, at the hearing on March 14, 1983, in answer to the court's question whether it "would agree that it is appropriate for the court to take judicial

notice of the Report," the attorney for the government responded, "absolutely." Despite this acquiescence, care should be taken to consider only trustworthy and reliable evidence. Thus, I look first to whether the documents proffered may be judicially noticed or otherwise admitted.

 Judicial notice may be taken of adjudicative facts in accordance with Fed. R.Evid. 201, as well as of legislative facts. The distinction between the two is not always readily apparent. *See* 1 Weinstein's Evidence ¶ 200[04], at 200–19. Adjudicative facts are usually those facts that are in issue in a particular case. Judicial notice of adjudicative facts dispenses with the need to present other evidence or for the factfinder to make findings as to those particular facts. Rule 201 provides that only those adjudicative facts which are not subject to reasonable dispute because they are generally known or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" may be judicially noticed.

 Legislative facts are "established truths, facts or pronouncements that do not change from case to case but [are applied] universally, while adjudicative facts are those developed in a particular case." *United States v. Gould,* 536 F.2d 216, 220 (8th Cir.1976). Legislative facts are facts of which courts take particular notice when interpreting a statute or considering whether Congress has acted within its constitutional authority. For example, courts frequently take judicial notice of legislative history, including committee reports. *See Territory of Alaska v. American Can Co.,* 358 U.S. 224, 227, 79 S.Ct. 274, 276, 3 L.Ed.2d 257 (1959). So, too, historical facts, commercial practices and social standards are frequently noticed in the form of legislative facts. *See Leo Sheep Co. v. United States,* 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979); *Jay Burns Baking Co. v. Bryan,* 264 U.S. 504, 517–33, 44 S.Ct. 412, 415–420, 68 L.Ed. 813 (1923) (Justice Brandeis' dissent takes an expansive view of when scientific and commercial practices may be judicially noticed);

and *United States v. Various Articles of Obscene Merchandise, Schedule No. 1303,* 562 F.2d 185, 187 n. 4 (2d Cir.1977).

However, petitioner seeks to have this court take judicial notice of the actual findings of the Commission and matters stated in documents contained in government files. To the extent these matters are offered on the issue of governmental misconduct they are offered on the ultimate issue. Taking judicial notice of them would be inappropriate, as it would render them conclusive according to Rule 201(g).

Care must be taken that Rule 201 not be used as a substitute for more rigorous evidentiary requirements and careful factfinding. For example, if the Commission's findings were proffered as public records under Rule 803(8), Fed.R.Evid., the foundational requirements of subparagraph (8) would need to be met and the findings, if admitted, would be weighed along with other evidence. Judicial notice cannot be used to shortcut the evidentiary hearing process. Nevertheless, courts have found it appropriate to take judicial notice of current economic conditions, *Mainline Investment Corp. v. Gaines,* 407 F.Supp. 423, 427 (N.D.Tex.1976) and historical evidence, *Oneida Indian Nation of New York v. New York,* 691 F.2d 1070, 1086 (2d Cir. 1982), as adjudicative facts under Rule 201. In these instances the facts judicially noticed went to the matter in issue, such as the defense of extraordinary economic cause asserted in a breach of contract claim in *Mainline Investment.* In *Oneida Indian Nation* the Second Circuit generally approved taking judicial notice of individual records, notes, correspondence, histories and other articles of the late eighteenth century as "historical evidence," but concluded that it was error for the lower court to do so where the data was in dispute. Indeed, this Circuit has urged a cautious approach, observing that "the taking of evidence, subject to established safeguards, is the best way to resolve controversies involving disputes of adjudicative facts."

**4.** *Cf. United States v. Wilson,* 690 F.2d 1267, 1273–74 (9th Cir.1982) (explaining the need to

*Banks v. Schweiker,* 654 F.2d 637, 640 (9th Cir.1981).

■ Two factors make the particular stance of this case unusual. The government has neither interposed any specific objection nor put any facts in controversy.[4] Furthermore, this is not a matter which will ultimately be decided by a jury. Where the function of the court is to act as a factfinder or exercise its discretion, more leeway to take judicial notice is justified. *See* C. McCormick, Evidence § 332 (2d ed. 1972). Still, the court should be careful in deciding whether to take judicial notice of the records proffered.

■ In light of these concerns, the court finds it proper to take judicial notice of the purpose of the Commission, the manner in which it was established and, subject to a finding of trustworthiness, the general nature and substance of its conclusions. Judicial notice of these facts may be used to inform the court's determination of whether denial of the motion would result in manifest injustice, of the public interest to be served by the granting of the motion, and of whether there is support for the government's acquiescence. *See Southern Louisiana Area Rate Cases v. Federal Power Commission,* 428 F.2d 407, 438 n. 98 (5th Cir.1970) (court may take judicial notice of concerns of the Federal Power Commission as expressed in speeches given by Commissioners even though specific facts stated may not be judicially noticed); *Overfield v. Pennroad Corp.,* 146 F.2d 889, 898 (3d Cir.1944) (court may take judicial notice of "Congressional proceedings and the *existence* of facts disclosed by them") (emphasis supplied).

The court concludes it is not proper or necessary to take judicial notice of the specific Commission findings and conclusions as adjudicative facts under § 201, despite

state with specificity the grounds for objections

**1416**

the government's failure to adequately object.[5]

## THE COMMISSION REPORT

The Commission on Wartime Relocation and Internment of Civilians was established in 1980 by an act of Congress. It was directed to review the facts and circumstances surrounding Executive Order 9066 and its impact on American citizens and permanent resident aliens; to review directives of the United States military forces requiring the relocation and, in some cases, detention in internment camps of American citizens, including those of Japanese ancestry; and to recommend appropriate remedies. Commission on Wartime Relocation and Internment of Civilians Act, Pub.L. No. 96–317, § 2, 94 Stat. 964 (1980).

The Commission was mandated to submit a written report of its findings and recommendations to Congress. It was given authority to conduct hearings, and to compel attendance of witnesses and production of documents, including documents in the possession of governmental agencies and departments.

The Commission was composed of former members of Congress, the Supreme Court and the Cabinet as well as distinguished private citizens. It held approximately twenty days of hearings in cities across the United States, taking the testimony of over 720 witnesses, including key government personnel responsible for decisions involved in the issuance of Executive Order 9066 and the military orders implementing it. The Commission reviewed substantial num-

bers of government documents, including documents not previously available to the public.

In light of all these factors, the Report carries substantial indicia of trustworthiness.[6] Indeed, as noted above, the government conceded at the March 1983 status conference that the Report was an appropriate subject of judicial notice. It acknowledged it was awaiting the final Report before formulating any policy with respect to this petition and related Japanese internment matters. After issuance of the Report, the government announced its decision to move to dismiss the charges. It appears it is relying on the Report in substantial measure for its own recommendations.[7]

The findings and conclusions of the Commission were unanimous. In general, the Commission concluded that at the time of the issuance of Executive Order 9066 and implementing military orders, there was substantial credible evidence from a number of federal civilian and military agencies contradicting the report of General DeWitt that military necessity justified exclusion and internment of all persons of Japanese ancestry without regard to individual identification of those who may have been potentially disloyal.

The Commission found that military necessity did not warrant the exclusion and detention of ethnic Japanese. It concluded that "broad historical causes which shaped these decisions [exclusion and detention]

and the consequences on appeal of the failure to do so).

**5.** It should be noted that the report appears to meet the requirements of Rule 803(8) of the Federal Rules of Evidence as findings resulting from an investigation made pursuant to authority granted by law. Under the Rule, it would be deemed admissible absent a showing of lack of trustworthiness. Advisory Committee Notes to Exceptions 803(8). *See also Letelier v. Republic of Chile*, 567 F.Supp. 1490, 13 Fed.R.Evid.Serv. 1731 (S.D.N.Y.1983). There is nothing to suggest the report lacks trustworthiness. Admission of the report under 803(8) would allow it to be weighed along with other evidence, if any, and permit the court to make its own findings. Were the court to take judicial notice of the

findings under Rule 201, by contrast, the findings would become conclusive.

**6.** *See Nebbia v. New York*, 291 U.S. 502, 516–18, 54 S.Ct. 505, 507–508, 78 L.Ed. 940 (1934) (joint legislative committee's report on the milk industry given substantial weight where over one year period the committee conducted thirteen public hearings, heard testimony of 254 witnesses, conducted extensive research and collected numerous exhibits).

**7.** *Personal Justice Denied* (Washington, D.C., 1982) presents the findings of the Commission on Wartime Relocation and Internment of Civilians. The final report, which is not before the court, apparently contains the Commission's recommendations.

were race prejudice, war hysteria and a failure of political leadership." As a result, "a grave injustice was done to American citizens and resident aliens of Japanese ancestry who, without individual review or any probative evidence against them, were excluded, removed and detained by the United States during World War II." *Personal Justice Denied* at 18.

The Commission's Report provides ample support for the conclusion that denial of the motion would result in manifest injustice and that the public interest is served by granting the relief sought.

## GOVERNMENT MEMORANDA

■ Petitioner offers another set of documents showing that there was critical contradictory evidence known to the government and knowingly concealed from the courts. These records present another question regarding the propriety of judicial notice. They consist of internal government memoranda and letters. Their authenticity is not disputed. Yet they are not the kind of documents that are the proper subject of judicial notice, and they are offered on the ultimate issue of governmental misconduct.

The internal memoranda and letters may, however, be considered by the court as evidence under Rule 803(1) or 803(16). Alternatively, because they are not actually offered for the truth of the statements contained in them, but rather as evidence that the statements were made (*i.e.*, verbal conduct), they may be admitted as non-hearsay within the purview of 801(c).[8]

■ The substance of the statements contained in the documents and the fact the statements were made demonstrate that the government knowingly withheld information from the courts when they were considering the critical question of military necessity in this case. A series of correspondence regarding what information should be included in the government's brief before the Supreme Court culminated

in two different versions of a footnote that was to be used to specify the factual data upon which the government relied for its military necessity justification. The first version read as follows:

The Final Report of General DeWitt (which is dated June 5, 1943, but which was not made public until January 1944) is relied on in this brief for statistics and other details concerning the actual evacuation and the events that took place subsequent thereto. *The recital of the circumstances justifying the evacuation as a matter of military necessity, however, is in several respects,* particularly with reference to the use of illegal radio transmitters and to shore-to-ship signalling by persons of Japanese ancestsry, *in conflict with information in the possession of the Department of Justice. In view of the contrariety of the reports on this matter we do not asks the Court to take judicial notice of the recital of those facts contained in the Report.*

Petitioner's Exhibit AA, Memorandum of John L. Burling to Assistant Attorney General Herbert Wechsler, September 11, 1944 (emphasis added).

After revision, it read:

The Final Report of General DeWitt (which is dated June 5, 1943, but which was not made public until January 1944) hereinafter cited as Final Report, is relied on in this brief for statistics and other details concerning the actual evacuation and the events that took place subsequent thereto. *The recital in the Final Report of circumstances justifying the evacuation as a matter of military necessity, however, is in several respects,* particularly with reference to the use of illegal radio transmitters and shore-to-ship signalling by persons of Japanese ancestry, *in conflict with the views of this Department. We, therefore, do not ask the Court to take judi-*

---

8. For all intents and purposes, there may be little difference between admitting them on a non-hearsay basis and taking judicial notice of their existence, as opposed to taking notice of the facts contained in them.

*cial notice of the recital of those facts contained in the Report.*

*Id.* (emphasis added).

The footnote that appeared in the final version of the brief merely read as follows:

The Final Report of General DeWitt (which is dated June 5, 1943, but which was not made public until January 1944), hereinafter cited as Final Report, is relied on in this brief for statistics and other details concerning the actual evacuation and the events that took place subsequent thereto. *We have specifically recited in this brief the facts relating to the justification for the evacuation, of which we ask the Court to take judicial notice, and we rely upon the Final Report only to the extent that it relates to such facts.*

Brief for the United States, *Korematsu v. United States,* October Term, 1944, No. 22, at 11. The final version made no mention of the contradictory reports. The record is replete with protestations of various Justice Department officials that the government had the obligation to advise the courts of the contrary facts and opinions. Petitioner's Exhibits A–FF. In fact, several Department of Justice officials pointed out to their superiors and others the "wilful historical inaccuracies and intentional falsehoods" contained in the DeWitt Report. *E.g.,* Exhibit B and Exhibit AA, Appendices A and B hereto.

These omissions are critical. In the original proceedings, before the district court and on appeal, the government argued that the actions taken were within the war-making powers of the Executive and Legislative branches and, even where the actions were directed at a particular class of persons, they were beyond judicial scrutiny so long as they were reasonably related to the security and defense of the nation and the prosecution of the war. Plaintiff's Brief in Opposition to Demurrer before the District Court, at 11–13; Brief for the United States in *Korematsu v. United States,* in

the Supreme Court of the United States, at 11–18.

Indeed, this emphasis on national security was reflected in the standard of review laid down in *Hirabayashi v. United States,* 320 U.S. 81, 95, 63 S.Ct. 1375, 1383, 87 L.Ed. 1774 (1943): "We think that constitutional government in time of war, is not so powerless and does not compel so hard a choice if those charged with the responsibility of our national defense have reasonable ground for believing that the threat is real." The Court acknowledged that it could not second guess the decisions of the Executive and Congress but was limited to determining whether all of the relevant circumstances "within the knowledge of those charged with the responsibility for maintaining the national defense afforded a rational basis for the decisions which they made." *Id.* at 102, 63 S.Ct. at 1386.

The government relied on the rationale of *Hirabayashi* in its memoranda in *Korematsu.* That rationale was adopted in *Korematsu.* 323 U.S. at 218–24, 65 S.Ct. at 195–197.

In *Hirabayashi* and *Korematsu,* the courts at each level engaged in an extensive examination of the facts known to the Executive and Legislative Branches. The facts which the government represented it relied upon and provided to the courts were those contained in a report entitled "Final Report, Japanese Evacuation from the West Coast" (1942), prepared by General DeWitt. His evaluation and version of the facts informed the courts' opinions. Yet, omitted from the government's representations was any reference to contrary reports which were considered reliable by the Justice Department and military officials other than General DeWitt.

A close reading of the briefs filed in the District Court by the government and amicus curiae State of California shows they relied heavily on the DeWitt Report for the facts justifying their military necessity arguments.[9]

---

**9.** The upper echelons of the Justice Department were well aware of the unjustified reliance be-

ing placed on the DeWitt Report by the amici curiae. "It is also to be noted that parts of the

There is no question that the Executive and Congress were entitled to reasonably rely upon certain facts and to discount others. The question is not whether they were justified in relying upon some reports and not others, but whether the court had before it all the facts known by the government. Was the court misled by any omissions or distortions in concluding that the other branches' decisions had a reasonable basis in fact? Omitted from the reports presented to the courts was information possessed by the Federal Communications Commission, the Department of the Navy, and the Justice Department which directly contradicted General DeWitt's statements. Thus, the court had before it a selective record.

Whether a fuller, more accurate record would have prompted a different decision cannot be determined. Nor need it be determined. Where relevant evidence has been withheld, it is ample justification for the government's concurrence that the conviction should be set aside. It is sufficient to satisfy the court's independent inquiry and justify the relief sought by petitioner.

## OTHER REQUIREMENTS FOR CORAM NOBIS RELIEF

Petitioner has met the other requirements necessary to have his petition for a writ of *coram nobis* granted. One of the factors traditionally considered relevant is generally described as "mootness", but is more specifically stated in terms of whether a petitioner who has already fully served his sentence suffers any collateral consequences such that he should be permitted to apply for a writ of *coram nobis*. At one time it was presumed that the burden was upon the petitioner to show the existence of collateral consequences. More recent cases have moved toward the view that collateral consequences are to be presumed from the fact of a criminal conviction. The

Supreme Court has, in fact, stated that a "criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." *Lane v. Williams*, 455 U.S. 624, 632, 102 S.Ct. 1322, 1327, 71 L.Ed.2d 508 (1982) (quoting approvingly *Sibron v. New York*, 392 U.S. at 57, 88 S.Ct. at 1899). This articulation places the burden on the government to show that petitioner suffers no collateral consequences. Petitioner has filed a certificate setting forth the collateral consequences he believes he suffers and will continue to suffer as a result of the conviction. The government, by its "Response" has failed to come forward with evidence to overcome the presumption.

The government has also failed to rebut petitioner's showing of timeliness. It appears from the record that much of the evidence upon which petitioner bases his motion was not discovered until recently. In fact, until the discovery of the documents relating to the government's brief before the Supreme Court, there was no specific evidence of governmental misconduct available.

There is thus no barrier to granting petitioner's motion for *coram nobis* relief.

## CONCLUSION

■ The Supreme Court has cautioned that *coram nobis* should be used "only under certain circumstances compelling such action to achieve justice" and to correct "errors of the most fundamental character." *United States v. Morgan*, 346 U.S. 502, 511–12, 74 S.Ct. 247, 252–253, 90 L.Ed. 248 (1954). It is available to correct errors that result in a complete miscarriage of justice and where there are exceptional circumstances. *See United States v. Hedman*, 655 F.2d 813, 815 (7th Cir.1981).

---

[DeWitt] report which, in April 1942 could not be shown to the Department of Justice in connection with the Hirabayashi case in the Supreme Court, were printed in the brief amici curiae of the States of California, Oregon and Washington. In fact the Western Defense Command evaded the statutory requirement that this

Department represent the Government in this litigation by preparing the erroneous and intemperate brief which the States filed." Exhibit B, p. 3, Memorandum from Edward J. Ennis, Director of the Alien Enemy Control Unit, Department of Justice to Assistant Attorney General Herbert Wechsler, September 30, 1944.

■ *Coram nobis* also lies for a claim of prosecutorial impropriety. This Circuit noted in *United States v. Taylor*, 648 F.2d at 573, that the writ "strikes at the veracity *vel non* of the government's representations to the court" and is appropriate where the procedure by which guilt is ascertained is under attack. The *Taylor* court observed that due process principles, raised by *coram nobis* charging prosecutorial misconduct, are not "strictly limited to those situations in which the defendant has suffered arguable prejudice; ... [but also designed] to maintain public confidence in the administration of justice." *Id.* at 571.

At oral argument the government acknowledged the exceptional circumstances involved and the injustice suffered by petitioner and other Japanese-Americans. See also Response at 2–3. Moreover, there is substantial support in the record that the government deliberately omitted relevant information and provided misleading information in papers before the court. The information was critical to the court's determination, although it cannot now be said what result would have obtained had the information been disclosed. Because the information was of the kind peculiarly within the government's knowledge, the court was dependent upon the government to provide a full and accurate account. Failure to do so presents the "compelling circumstance" contemplated by *Morgan*. The judicial process is seriously impaired when the government's law enforcement officers violate their ethical obligations to the court.[10]

This court's decision today does not reach any errors of law suggested by petitioner. At common law, the writ of *coram nobis* was used to correct errors of fact. *United States v. Morgan*, 346 U.S. 502, 507–13, 74 S.Ct. 247, 250–253, 90 L.Ed. 248 (1954). It was not used to correct legal errors and this court has no power, nor does it attempt, to correct any such errors.

Thus, the Supreme Court's decision stands as the law of this case and for whatever precedential value it may still have. Justices of that Court and legal scholars have commented that the decision is an anachronism in upholding overt racial discrimination as "compellingly justified." "Only two of this Court's modern cases have held the use of racial classifications to be constitutional." *Fullilove v. Klutznick*, 448 U.S. 448, 507, 100 S.Ct. 2758, 2789, 65 L.Ed.2d 902 (1980) (Powell, J., concurring and referring to *Korematsu* and *Hirabayashi v. United States*, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943)). *See also* L.H. Tribe, *American Constitutional Law* §§ 16–6, 16–14 (1978). The government acknowledged its concurrence with the Commission's observation that "today the decision in *Korematsu* lies overruled in the court of history."

*Korematsu* remains on the pages of our legal and political history. As a legal precedent it is now recognized as having very limited application. As historical precedent it stands as a constant caution that in times of war or declared military necessity our institutions must be vigilant in protecting constitutional guarantees. It stands as a caution that in times of distress the shield of military necessity and national security must not be used to protect governmental actions from close scrutiny and accountability. It stands as a caution that in times of international hostility and antagonisms our institutions, legislative, executive and judicial, must be prepared to exercise their authority to protect all citizens from the petty fears and prejudices that are so easily aroused.

ORDER

In accordance with the foregoing, the petition for a writ of *coram nobis* is granted and the counter-motion of the respondent is denied.

IT IS SO ORDERED.

---

**10.** Recognizing the ethical responsibility to make full disclosure to the courts, Director Ennis pointed out to the Assistant Attorney General that "[t]he Attorney General should not be deprived of the present, and perhaps only, chance to set the record straight." Exhibit B, p. 4, Appendix A hereto.

APPENDIX A

EXHIBIT B

ED WARD J. ENNIS
DIRECTOR

KEPLY TO:

*1958*

**Department of Justice**

**Alien Enemy Control Unit**

**Washington**

September 30, 1944

*Noted
C. 7-*

MEMORANDUM FOR MR. HERBERT WECHSLER

Re: Korematsu v. United States

I understand that the War Department is currently discussing with the Solicitor General the possibility of changing the footnote in the Korematsu brief in which it is stated that this Department is in possession of information in conflict with the statements made by General DeWitt relating to the causes of the evacuation. Mr. Burling and I feel most strongly that three purposes are to be served by keeping the footnote in its present form. (1) This Department has an ethical obligation to the Court to refrain from citing it as a source of which the Court may properly take judicial notice if the Department knows that important statements in the source are untrue and if it knows as to other statements that there is such contrariety of information that judicial notice is improper. (2) Since the War Department has published a history of the evacuation containing important misstatements of fact, including imputations and inferences that the inaction and timidity of this Department made the drastic action of evacuation necessary, this Department has an obligation, within its own competence, to set the record straight so that the true history may ultimately become known. (3) Although the report deals extensively with the activities of this Department and with the relationship of the War Department to this Department, the report was published without its being shown to us. In addition, when we learned of its existence, we were on one occasion advised that the report would never be published and, on another occasion when we asked that release be held up so that we could consider it, we were told that the report had already been released although in fact the report was not released until two weeks thereafter. In view of the War Department's course of conduct with respect to the report, we are not required to deal with the report very respectfully.

### I

As to the propriety of taking judicial notice of the contents of the report, it will be sufficient to point out that (1) the report makes an important misstatement concerning our published alien enemy procedures; (2) the report makes statements concerning radio transmissions directly contradicted by a letter from the Federal Communications Commission, and (3) the report makes assertions concerning radio transmissions and ship-to-shore signaling directly contradicted by a memorandum from the Federal Bureau of Investigation.

### II

The wilful historical inaccuracies of the report are objectionable for two different reasons. (1) The chief argument in the report as to the necessity for the evacuation is that the Department of Justice was slow in enforcing alien enemy control measures and that it would not take the necessary steps to prevent signaling whether by radio or by lights. It asserts that radio transmitters were located within

general areas but this Department would not permit mass searches to find them. It asserts that signaling was observed in mixed occupancy dwellings which this Department would not permit to be entered. Thus, because this Department would not allow the reasonable and less drastic measures which General DeWitt wished, he was forced to evacuate the entire population. The argument is untrue both with respect to what this Department did and with respect to the radio transmissions and signaling, none of which existed, as General DeWitt at the time well knew. (2) The report asserts that the Japanese-Americans were engaged in extensive radio signaling and in shore-to-ship signaling. The general tenor of the report is not only to the effect that there was a reason to be apprehensive, but also to the effect that overt acts of treason were being committed. Since this is not so it is highly unfair to this racial minority that these lies, put out in an official publication, go uncorrected. This is the only opportunity which this Department has to correct them.

### III.

As to the relations of this Department to the report, the first that we knew of its existence was in April, 1942, when we requested Judge Advocate General Cramer to supply any published material in the War Department's possession on the military situation on the West Coast at the time of the evacuation to be used in the Hirabayashi brief in the Supreme Court. Colonel Watson, General DeWitt's Judge Advocate, stated that General DeWitt's report was being rushed off the press and would be available for consideration. I was then advised, however, that the printed report was confidential and I could not see it but I was given 40 pages torn out of the report on the understanding that I return them which, unfortunately, I have done. Because these excerpts misstated the facts as I knew them and misstated the relations between the Department of Justice and the War Department, I suggested to the Solicitor General that he might wish to discuss with the Attorney General the matter of

the Attorney General taking up with the Secretary of War the question of showing us this report before it was released. Colonel Watson then advised me that Mr. McCloy was treating the report as a draft and my personal recollection is that Mr. McCloy stated in Mr. Biddle's presence that it was not intended to print this report. We did not hear about this report again until over six months later when I learned accidentally from Mr. Myer of WRA that he had a copy of the report which the War Department was going to publish. I borrowed his copy and then Mr. Burling called Captain Hall, Mr. McCloy's Assistant Executive Officer, and pointed out to him that the report undertook to discuss relations between the War and Justice Departments without giving us a chance to examine it and it was my understanding that Mr. McCloy did not intend to have the report released. Captain Hall admitted that Mr. McCloy had stated that the report was not to be issued but stated that he was sorry but the report had already been released and there was nothing that could be done. We accepted his statement as true and did not check on it until two weeks had passed without any publicity and then when the report was discussed in the newspapers we checked with the public relations office of the War Department and they advised that the report had just been released and had not been released at the time Captain Hall said it had.

It is also to be noted that parts of the report which, in April 1942 could not be shown to the Department of Justice in connection with the Hirabayashi case in the Supreme Court, were printed in the brief amici curiae of the States of California, Oregon and Washington. In fact the Western Defense Command evaded the statutory requirement that this Department represent the Government in this litigation by preparing the erroneous and intemperate brief which the States filed.

It is entirely clear that the War Department entered into an arrangement with the Western Defense Command to rewrite demonstrably erroneous items in the report

by reducing to implication and inference what had been expressed less expertly by the Western Defense Command and then contrived to publish this report without the knowledge of this Department by the use of falsehood and evasion.

For your information I annex copies of (a) my memorandum of April 20, 1943 to the Solicitor General, (b) my memorandum of January 21, 1944 to the Solicitor General, (c) my memorandum of February 26, 1944 to the Attorney General, and (d) a transcript of Mr. Burling's conversation of January 7, 1944 with Captain Hall which clearly brings out the evasion and falsehood used in connection with the publication of the report.

I also annex copies of memoranda from the FBI and of an exchange of correspondence between the Attorney General and the Chairman of the Federal Communications Commission which establish clearly that the facts are not as General DeWitt states them in his report and also that General DeWitt knew them to be contrary to his report.

RECOMMENDATION: In view of the Attorney General's personal participation in, and final responsibility for, this Department's part in the broad administrative problem of treatment of the Japanese minority, I urge that he be consulted personally on this problem. Much more is involved than the wording of the footnote. The failure to deal adequately now with this Report cited to the Supreme Court either by the Government or other parties, will hopelessly undermine our administrative position in relation to this Japanese problem. We have proved unable to cope with the military authorities on their own ground in these matters. If we fail to act forthrightly on our own ground in the courts, the whole historical record of this matter will be as the military choose to state it. The Attorney General should not be deprived of the present, and perhaps only, chance to set the record straight.

/s/ Edward J. Ennis
Edward J. Ennis

## APPENDIX B

### EXHIBIT A

MR. HERBERT WECHSLER

J. L. BURLING

SEP 11 1944

SUBJECT: *Korematsu v. U.S.*

Assistant Attorney General
War Division

The Solicitor General has gone over the revised page proof of the brief and has made certain additional changes. I desire to invite your attention particularly to the footnote which appears on page 11 of the revised page proof. As set out in the first page proof at page 26, the footnote read:

"The Final Report of General DeWitt (which is dated June 5, 1943, but which was not made public until January 1944) is relied on in this brief for statistics and other details concerning the actual evacuation and the events that took place subsequent thereto. The recital of the circumstances justifying the evacuation as a matter of military necessity, however,

is in several respects, particularly with reference to the use of illegal radio transmitters and to shore-to-ship signalling by persons of Japanese ancestry, in conflict with information in the possession of the Department of Justice. In view of the contrariety of the reports on this matter we do not ask the Court to take judicial notice of the recital of those facts contained in the Report."

As Mr. Fahy has revised it, it reads: "The Final Report of General DeWitt (which is dated June 5, 1943, but which was not made public until January 1944) hereinafter cited as Final Report, is relied on in this brief for statistics and

other details concerning the actual evacuation and the events that took place subsequent thereto. The recital in the Final Report of circumstances justifying the evacuation as a matter of military necessity, however, is in several respects, particularly with reference to the use of illegal radio transmitters and shore-to-ship signalling by persons of Japanese ancestry, in conflict with the views of this Department. We, therefore, do not ask the Court to take judicial notice of the recital of those facts contained in the Report."

You will recall that General DeWitt's report makes flat statements concerning radio transmitters and ship-to-shore signalling which are categorically denied by the FBI and by the Federal Communications Commission. There is no doubt that these statements were intentional falsehoods, inasmuch as the Federal Communications Commission reported in detail to General DeWitt on the absence of any illegal radio transmission.

In addition, there are other misstatements of fact which seek to blame this Department with the evacuation by suggesting that we were derelict in our duties. These are somewhat more complicated but they are nevertheless demonstrably false.

In view of the fact that General DeWitt in his official report on the evacuation has sought to justify it by making important misstatements of fact, I think it important that this Department correct the record insofar as possible and certainly we should not ask the Court to take judicial notice of those facts.

The War Department has no proper complaint as to our disavowal of the recital of the facts. When we were preparing the Hirabayashi brief we heard that the report had been made and asked for a copy of it for our use. We were told that it was secret but that the Army would temporarily lend us certain pages torn out of the report. We did examine these pages in May 1943 and then returned them to the War Department. (Some of these pages then turned up in a brief filed in the *Hirabayashi* case, without our knowledge, by

the States of California, Oregon and Washington as amici curiae) Mr. McCloy advised Mr. Ennis at this time that DeWitt's Final Report would not be made public.

We next heard of the report in January 1944. At Mr. Ennis' direction, I called Captain Hall, who was Captain Fisher's predecessor, and asked that the publication of the report be withheld until this Department might examine the full report and make comments concerning the report's discussion of the role played by this Department. Captain Hall stated that the report had already been published and it was too late to do anything about it. The report, however, was not published until two weeks later when it was released to the press. I verified this through the Army's Publications and Public Relations officers and there was no question but that Captain Hall's statement on this subject was untrue and that there would have been time to permit this Department to make representations with respect to the publication of a report placing the responsibility on it in part for the necessity of the evacuation, had the War Department seen fit to permit this Department to inspect the report prior to publication.

In view of all these circumstances, it seems to me that the present bowdlerization of the footnote is unfortunate. There is in fact a contrariety of information and we ought to say so. The statements made by General DeWitt are not only contrary to our views but they are contrary to detailed information in our possession and we ought to say so.

I press the point not only because I would like to see the footnote restored to its earlier form, if possible, but because it is now contemplated that the revised brief be submitted again to the War Department. I assume that the War Department will object to the footnote and I think we should resist any further tampering with it with all our force.