William HOHRI, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 83–0750.

United States District Court,
District of Columbia.

May 17, 1984.

Benjamin L. Zelenko, B. Michael Rauh, Ellen Godbey Carson, Landis, Cohen, Singman & Rauh, Washington, D.C., for plaintiffs.

J. Paul McGrath, Asst. Atty. Gen., Richard K. Willard, Acting Asst. Atty. Gen., Jeffrey Axelrad, Atty., Torts Branch, Civil Div., Dept. of Justice, Stanley E. Harris, Joseph E. diGenova, U.S. Attys., Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

During World War II, the United States government removed some 120,000 American citizens and residents of Japanese ancestry from their West Coast homes and placed them in internment camps for up to four years. The stated reason for this unprecedented policy of evacuation and incarceration was "military necessity": the Nation was at war with Japan, and military officials feared that members of the American Japanese population would engage in sabotage, espionage, and other activities harmful to the war effort.

In 1983, nineteen individuals who were interned during the war or descended from internees and an organization of Japanese Americans filed this suit against the United States.[1] They allege that the program of exclusion and internment was wrongful and seek compensation for injuries suffered as a result of it. They claim that there was no military necessity for the program and that it was instead motivated by "race prejudice, war hysteria, and a failure of political leadership."[2] Further-

---

1. Plaintiffs have moved for class action certification, defining the class as the approximately 120,000 citizens and permanent residents, and representatives of such persons no longer living, who were "subjected to forcible segregation, arrest, exclusion, imprisonment, curfew and travel restrictions, deportation, loss of citizenship, or other deprivations of their civil rights and liberties" because of their Japanese ancestry pursuant to actions and orders of the United States. Plaintiffs' Motion for Class Action Certification (June 14, 1983). By agreement of the parties, decision on the class action motion has been postponed pending resolution of defendant's motion to dismiss.

2. Complaint, ¶ 3 (quoting Commission on Wartime Relocation and Internment of Civilians, *Personal Justice Denied* 18 (1982)). The Commission was established by act of Congress in 1980 to review the treatment of Japanese Americans during World War II and recommend appropriate remedies. Its report, which concludes that there was no military necessity for the program and that this fact was known by responsible officials during the war, is in large part the genesis of this suit. *See* Plaintiffs' Supplemental Memorandum on the Statute of Limitations at 2–3 (Jan. 20, 1984).

more, they allege that government and military officials were aware of this lack of military justification but conspired to suppress that information when the program was implemented, when it was later challenged in court, and, in fact, almost to the present. Plaintiffs claim to have suffered deprivation of their constitutional rights, loss of homes, businesses, educations, and careers, physical and psychological injuries, including loss of life, destruction of family ties, and personal stigma. The complaint contains twenty-two counts; each plaintiff seeks compensatory damages for each tort claim and $10,000 for each cause of action not sounding in tort.[3]

The defendant United States has moved to dismiss plaintiffs' claims for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. That motion proceeds on three grounds. First, defendant asserts that plaintiffs' action is barred by the applicable statutes of limitation. Second, defendant alleges that the American-Japanese Evacuation Claims Act, 50 U.S.C.App. §§ 1981–1987, is the exclusive remedy for claims arising from the internment program. Third, defendant asserts that there is no constitutional provision, statute, or regulation that waives the federal government's sovereign immunity against these claims for money damages.[4]

Plaintiffs oppose the motion to dismiss. They claim that alleged suppression by defendant of information contradicting the military necessity rationale constituted fraud sufficient to toll the running of the statutes of limitation. They dispute that the Evacuation Claims Act is exclusive of other remedies, because it fails to comport with constitutional standards of due process, just compensation, and equal protection. Finally, they point to several statutes and constitutional provisions which they claim act to waive the federal government's sovereign immunity against this suit.

## I.

In evaluating a motion to dismiss under Rule 12(b)(1), a court must construe the allegations of the complaint "favorably to the pleader." *Walker v. Jones*, 733 F.2d 923 at 925 (D.C.Cir. May 1, 1984) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)). In addition, a court may consider material outside the pleadings, such as official documents, matters of general public record, and historical publications. *See* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1350, at 549–50 (1969). The following recitation of the facts is drawn from plaintiffs' complaint, official documents attached as exhibits to the complaint, the 1982 report of the Commission on Wartime Relocation and Internment of Civilians,[5] and other published historical accounts cited by the parties.

The use of official historic documents is particularly appropriate here. They relate to events which occurred more than forty years ago. Most of the actors who might give better evidence are no longer living. It is unlikely that the historical facts recounted in the documents can ever be the subject of a material dispute. Moreover, although the government could offer the documents to support its defense, they are more embarrassing to the government than self-serving. Accordingly, the documents

---

3. Plaintiffs also seek relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the All Writs Act, 28 U.S.C. § 1651.

4. An affirmative defense such as a bar by a statute of limitations normally is raised through a motion to dismiss based on Rule 12(b)(6). In this suit against the United States, however, the relevant statutes of limitation are conditions placed on waivers of sovereign immunity. As such, their expiration would deprive the Court of subject matter jurisdiction. In that case, a statute of limitations defense would be raised

through a motion to dismiss based on Rule 12(b)(1). *See D.C. Transit System, Inc. v. United States*, 717 F.2d 1438, 1440 n. 1 (D.C.Cir.1983); 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1350, at 139–40 (Supp.1984). Defendant cites both rules in support of its motion. This ruling is based on Rule 12(b)(1).

Defendant also moves to dismiss for improper venue under Rule 12(b)(3). The Court does not reach that question.

5. Hereinafter cited as *Personal Justice Denied.*

have been considered in ruling on this motion to dismiss for lack of subject matter jurisdiction. *See Capitol Industries-EMI, Inc. v. Bennett,* 681 F.2d 1107, 1118 n. 29 (9th Cir.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed.2d 932 (1982).

### A.

On December 7, 1941, a carrier-based force of Japanese aircraft attacked the American fleet at Pearl Harbor, inflicting heavy losses. The next day, the United States declared war on Japan. Steps to control the activities of Japanese nationals in the United States began immediately. On December 8, President Roosevelt proclaimed that residents of Japanese nationality were "alien enemies." Proclamation No. 2525, 6 Fed.Reg. 6321 (1941). The proclamation authorized the Attorney General to regulate their conduct and to apprehend any such persons "deemed dangerous to the public health or safety of the United States."[6] Pursuant to other proclamations, cameras, weapons, radio transmitters, and other instruments of possible sabotage and espionage that belonged to enemy aliens were confiscated. Internment of alien enemies—Japanese, German, and Italian—who were believed to be dangerous began immediately. In late January and early February, the Attorney General ordered that enemy aliens could not enter some 84 designated areas of military significance on the West Coast.

These restrictions, however, did not satisfy Lieutenant General John L. DeWitt, who as Commanding General of the Western Defense Command was responsible for West Coast security. The general urged that military necessity required increasing the geographic area of exclusion and barring American citizens, as well as aliens, of Japanese descent. In this, he was supported by public officials and popular opinion on the West Coast, where there was a

history of antagonism toward the Japanese. Consultation among members of the Western Defense Command, the War Department, and the Justice Department culminated with a formal recommendation by General DeWitt to Secretary of War Henry L. Stimson "for the evacuation of Japanese and other subversive persons from the Pacific Coast." *Final Recommendation of the Commanding General, Western Defense Command and Fourth Army to the Secretary of War* (Feb. 14, 1942) (Complaint, Exhibit G). On February 18, officials of the War and Justice Departments met to draft such an order, and it was signed by President Roosevelt on February 19 as Executive Order 9066, 7 Fed.Reg. 1407 (Complaint, Exhibit H).

Executive Order 9066 authorized the Secretary of War and military commanders to whom he delegated authority to prescribe "military areas" from which any persons could be excluded.[7] The next day, Secretary of War Stimson delegated his authority under Executive Order 9066 to General DeWitt. Within ten days, DeWitt designated the western halves of California, Oregon, and Washington and the southern third of Arizona as "military areas" from which all persons of Japanese ancestry were to be removed. Later, he expanded the evacuation area to include the rest of California.

Relocation was tried first on a voluntary basis. Japanese Americans were instructed to move outside the military areas but were free to go wherever they chose. At the same time, curfews and reporting requirements were imposed. The voluntary program quickly proved unworkable. Objections to receiving "potential saboteurs and spies" were raised by officials of interior western states where evacuees resettled. Movement was slow, since many evacuees had trouble selling homes and busi-

---

**6.** German and Italian aliens were given the same status in Proclamation Nos. 2526, 2527, 6 Fed.Reg. 6323, 6324 (1941).

**7.** Congress ratified the President's action one month later by enacting Pub.L. No. 503, 56 Stat. 173 (codified at 18 U.S.C. § 97a (1946)). That

statute authorized the arrest, fine, and imprisonment of anyone violating an order issued pursuant to Executive Order 9066. *See Hirabayashi v. United States,* 320 U.S. 81, 91, 63 S.Ct. 1375, 1381, 87 L.Ed. 1774 (1943).

nesses and finding new housing and means of livelihood. It was soon determined that relocation should be mandatory.

To that end, President Roosevelt issued Executive Order 9102, 7 Fed.Reg. 2165 (Mar. 20, 1942), which established the War Relocation Authority (WRA) and authorized it "to provide for the removal from designated areas of persons whose removal is necessary in the interest of national security ...." Under the new evacuation plan, the Army was to remove the Japanese Americans from designated military areas to temporary assembly centers, where they would be assigned to permanent camps run by the WRA. The relocation began near Seattle on March 24. By August 7, some 108 Civilian Exclusion Orders had been issued, resulting in the evacuation of about 92,000 people to assembly centers, where they remained for an average of about 100 days before moving to relocation camps. Some 70 percent were citizens of the United States.

Evacuees were given as little as forty-eight hours notice of an impending evacuation. According to the exclusion orders, government-run "Civil Control Stations" were to "provide services with respect to the management, leasing, sale, storage or other disposition of most kinds of property including: real estate, business and professional equipment, buildings, household goods, boats, automobiles, livestock, etc." In addition, the government stated that it would provide for storage at the owner's risk of substantial household items and other belongings packed in crates. *See, e.g.,* Civil Exclusion Order No. 5 (Apr. 1, 1942) (Complaint, Exhibit I).

There were sixteen assembly centers, all but three in California. Generally, assembly centers were organized around "blocks," a group of living units housing 600 to 800 people. Each block had showers, lavatories, toilets, and in most cases its own mess hall. The camps themselves were surrounded by fences and search lights and secured by military and internal police.

The transfer of evacuees from assembly centers to permanent relocation camps began in May 1942; by its completion, the WRA would have some 120,000 individuals its custody. There were ten camps, built on federal land in Utah, Arizona, Colorado, Wyoming, Arkansas, Idaho, and California. Several of the sites were located in arid desert land, and most suffered from severe weather conditions at some time during the year. The camps were surrounded by barbed wire, watchtowers, and armed guards. Living accommodations were arranged in the block style. Typically, one block contained twelve to fourteen barracks, a mess hall, baths, showers, toilets, a laundry and a recreation hall. Each barrack had 2000 to 2400 square feet of floor space and was divided into four to six rooms. One room would house to family, sometimes two. Employment outside the centers was not permitted; work was made available at the centers for $12 to $19 a month. Food, shelter, medical care, and education were provided to the evacuees free of charge, but even when their value was added to the low salaries, the economic hardship imposed by the internment was obvious.

Initially, no evacuee was allowed to leave the center except in emergencies, and then only in the company of a non-Japanese escort. Soon exceptions were made for evacuees to continue their college educations in the interior and to provide farm labor. By October 1942, a formal leave system had been instituted that allowed short-term leave, work group leave for seasonal employment, and indefinite leave— the equivalent of relocation—for educational, employment, or other reasons. The next year, government officials adopted a more sweeping release plan in order to enlist Japanese Americans as soldiers. In February 1943, a "loyalty" questionnaire was administered to all evacuees over seventeen years of age. The information provided by these questionnaires was used to determine eligibility for enlistment and for leave and relocation outside the camps.

As the leave and relocation plans went into effect, the government moved to iso-

late evacuees who were viewed as security risks. The relocation center in Tule Lake, California, was designated to receive persons who "by their acts have indicated that their loyalties lie with Japan during the present hostilities or that their loyalties do not lie with the United States." *Personal Justice Denied* at 208 (quoting WRA Administrative Instruction No. 100 (July 15, 1943); WRA Administrative Manual § 110.1 (Oct. 6, 1943)). This included individuals who had applied for expatriation or repatriation to Japan, those who did not answer yes to the loyalty questionnaire, or those who were suspect for other reasons. Security measures around the camp were reinforced, including the addition of six tanks. Facilities were overcrowded, and numerous disturbances broke out. *Personal Justice Denied* at 209.

The implementation of the loyalty review and release program prompted a heated debate between the War Department and the Western Defense Command over continued exclusion of Japanese Americans from the West Coast. General DeWitt took the position that loyal Japanese Americans could not be separated from disloyal, so that all should be excluded; he argued in addition that public opinion would not support a reversal in policy. Officials in the War Department urged that the loyal could be distinguished from the disloyal. After Pearl Harbor, there had been insufficient time to do so. But now that loyalty could be established on an individual basis through the loyalty questionnaire, they opposed continuing the exclusion.

The first significant breach in the policy of exclusion occurred in April 1943, when Japanese Americans in the armed forces were allowed to return to the West Coast on furlough. By Spring of 1944, efforts to end exclusion had gained momentum. In February, the WRA had been placed within the Interior Department, which opposed the evacuation. On May 26, 1944, Secre-

tary of War Stimson proposed at a cabinet meeting that exclusion be ended. General Bonesteel, the new Commanding General of the Western Defense Command,[8] wrote to a War Department official on July 3, 1944, to state that there was no longer a military necessity for exclusion. The Navy concurred in that judgment in September. In fact, Bonesteel began on a small scale to allow Japanese Americans to return to the West Coast during the Spring of 1944.[9] President Roosevelt declined to do anything "drastic or sudden," however. In the opinion of the Commission on Wartime Relocation, Roosevelt did not wish to impair his reelection chances in the West. *Personal Justice Denied* at 229.

The decision to lift the West Coast exclusion was made in a cabinet meeting on November 10, 1944, immediately following the election. The War Department publicly rescinded the mass exclusion order on December 17, 1944, although individual exclusions were continued in effect. The repatriation was slow; by August, 1945, when Japan surrendered, over half of the evacuated population remained in the United States' custody. Even though all individual exclusion orders and military restrictions against the Japanese were revoked on September 4, the last relocation camp was not closed until March 1946.

### B.

The claims of military necessity that underlay the promulgation of Executive Order 9066 and its subsequent implementation are stated in two official reports filed by General DeWitt during the war: the *Final Recommendation of the Commanding General, Western Defense Command and Fourth Army, Submitted to The Secretary of War* and *Final Report: Japanese Evacuation from the West Coast 1942.* The *Final Recommendation*, submitted on February 14, 1942, stated that

---

**8.** General DeWitt left the Western Defense Command in Fall 1943.

**9.** Those permitted to return included individuals who had brought suit challenging their ex-

clusion. It is alleged that these individuals were readmitted to moot their challenges. *See Personal Justice Denied* at 231–32.

Japanese naval attacks on shipping and coastal cities were "probable," as were air raids and sabotage of vital installations within the Western Defense Command. It claimed that these enemy activities would be assisted by agents in the United States. The 112,000 individuals of Japanese ancestry living in the area were "potential enemies" because of their ties to Japan and were "at large today." DeWitt wrote

> In the war in which we are now engaged racial affinities are not severed by migration. The Japanese race is an enemy race and while many second and third generation Japanese born on United States soil, possessed of United States citizenship, have become "Americanized", the racial strains are undiluted. To conclude otherwise is to expect that children born of white parents on Japanese soil sever all racial affinity and become loyal Japanese subjects, ready to fight and, if necessary, to die for Japan in a war against the nation of their parents. That Japan is allied with Germany and Italy in this struggle is no ground for assuming that any Japanese, barred from assimilation by convention as he is, though born and raised in the United States, will not turn against this nation when the final test of loyalty comes.

DeWitt claimed, without elaboration, that "indications" existed that these individuals were organized for concerted activity; "[t]he very fact that no sabotage has taken place to date is a disturbing and confirming indication that such action will be taken."

DeWitt attempted to substantiate these claims in his *Final Report*.[10] Citing the United States' deteriorating military position in the Pacific theater, three isolated attacks on West Coast targets, and interference with Pacific shipping, DeWitt concluded that the West Coast was exposed to attack. DeWitt predicted that such an attack, if it came, would receive significant support from segments of the Japanese American population. To support this claim, he pointed to FBI raids on the premises of Japanese aliens immediately following Pearl Harbor which discovered ammunition, rifles, shotguns, and "maps of all kinds." *Final Report* at 8. He claimed there were hundreds of reports each night of signal lights visible from the coast and of unidentified radio transmissions. He noted that Japanese Americans, "by design or accident," had located many of their communities near vital installations. *Id.* at 9. And he repeated his racial arguments. The Japanese Americans, according to DeWitt, were

> a large, unassimilated, tightly-knit racial group, bound to an enemy nation by strong ties of race, culture, custom and religion . . . .

*Id.* at vii.[11] DeWitt claimed that hundreds of Japanese American organizations on the West Coast were actively advancing Japanese war aims and that thousands of American-born Japanese had been educated in Japan, where they were indoctrinated and became "rabidly pro-Japanese." *Id.* DeWitt contended that it was impossible to isolate these disloyal Japanese Americans from the loyal. Therefore, it was necessary to remove them all from the West Coast.

DeWitt's *Final Recommendation* and *Final Report* have been challenged for inaccuracy as well as racial animus. DeWitt's intelligence apparatus during the early part of the war was criticized for giving credence to every rumor. Major

---

**10.** The *Final Report* was dated June 5, 1943, but was not published until 1944.

**11.** Even though the West Coast population included second and third generations of Japanese immigrants, DeWitt argued that the ties to Japan were undiluted. He expressed his opinions more explicitly before a House Committee on April 13, 1943, when he said:

> I don't want any of them [the Japanese] here [on the West Coast]. They are a dangerous element. There is no way to determine their loyalty.

*Personal Justice Denied* at 221. The next day, in an off-the-record news conference that found its way into print, DeWitt stated that

> As I told the War Department, the Japanese Government finding out we are bringing these men in, it is the ideal place to infiltrate men in uniform . . . . [A] Jap is a Jap.

*Id.* at 222.

General Joseph W. Stilwell, who served under DeWitt in December 1941, stated that in the San Francisco headquarters of the Western Defense Command "Common sense is thrown to the winds and any absurdity is believed." *Personal Justice Denied* at 64. DeWitt's security concerns were contradicted by several other individuals and organizations doing intelligence work on the West Coast. In November 1941, President Roosevelt and the War Department received a report from Curtis B. Munson, a Chicago businessman, who advised that "There is no Japanese 'problem' on the Coast. There will be no armed uprising of Japanese." C. Munson, *Japanese on the West Coast* (Complaint, Exhibit C). Munson thought it likely that covert agents would be "imported" from Japan and would not come from the local Japanese, who are "loyal to the United States or, at worst, hope that by remaining quiet they can avoid concentration camps or irresponsible mobs." He noted that potential sabotage suspects were already under surveillance. Due to a lack of strategic planning by the United States, however, Munson was unwilling to conclude that there was no danger from the Japanese living in the United States.

Munson's report was impressionistic; a detailed, complete analysis of the Japanese situation on the West Coasts was submitted to the Chief of Naval Operations on January 26, 1942, by Lieutenant Commander Kenneth D. Ringle, an expert on Japanese intelligence in the Office of Naval Intelligence. *See* K. Ringle, *Report on Japanese Question* (Complaint, Exhibit D). Ringle concluded that at least 75 percent of the American-born United States citizens of Japanese ancestry were loyal to the United States and that a large majority of the alien residents were at least "passively loyal." He identified those groups most suspected of disloyalty and estimated their number as a small fraction of the Japanese American population. He noted that the most dangerous of these individuals were already in custody and that most of the others were known to the FBI and other government organizations. He recom-

mended immediate detention for the remainder of the dangerous element, both citizens and aliens. He urged, however, that the so-called "Japanese Problem" be handled on an individual, not racial, basis. "[I]n short," he concluded, "the entire 'Japanese Problem' has been magnified out of its true proportion, largely because of the physical characteristics of the people; ... it is no more serious than the problems of the German, Italian, and Communistic portions of the United States population ...." *Id.* at 3.

DeWitt's *Final Report* cited numerous reports of unauthorized radio and light signals on the West Coast as evidence of the need for evacuation. Those claims were directly contradicted by reports DeWitt received from the Federal Communications Commission (FCC), which monitored transmissions on the West Coast and provided its findings on a continuous basis to DeWitt. According to an April 1944 letter from FCC Chairman James L. Fly to the Attorney General, the FCC's Radio Intelligence Division conducted a 24-hour surveillance of the entire radio spectrum from December 1941 to July 1, 1942. At the request of DeWitt, the Commission supplemented its sophisticated surveillance apparatus with mobile direction-finding intercept units to pick up ship-to-shore transmissions. The Commission was "deluged" with reports of suspicious transmissions; upon investigation, no transmission was ever found to be "other than legitimate." DeWitt's *Final Report* claimed that reports of radio and light signaling were virtually eliminated after the evacuation. The FCC found that the number of reports was not affected by the evacuation. Finally, DeWitt had asserted in a memorandum to the Assistant to the Attorney General that he did not have the capacity to track down suspected transmitters to an area smaller than a city block. The FCC in fact had the capacity to pinpoint a transmitter to a particular room within a building. Letter from FCC Chairman James L. Fly to Attorney General Francis Biddle (Apr. 4, 1944) (Complaint, Exhibit E).

Federal Bureau of Investigation Director J. Edgar Hoover also denied that illicit shore-to-ship signaling had occurred early in the war. In a letter to the Attorney General dated February 7, 1944, Hoover said that every complaint of illicit signaling had been investigated and had revealed nothing. Hoover also said that there was no information that could link espionage activity ashore to Japanese attacks on ships leaving West Coast ports. M. Grodzins, *Americans Betrayed* 291 (1949).

### C.

Numerous aspects of the exclusion and internment program were challenged in civil and criminal proceedings during the war.[12] Several of those cases reached the Supreme Court, where the constitutionality of the government's treatment of Japanese Americans was tested. In *Hirabayashi v. United States*, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943), the Court considered whether the imposition of curfew regulations on Japanese Americans was a legitimate exercise of the constitutional power to wage war.[13] In *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), the same issue was raised with respect to the decision to exclude Japanese Americans from the West Coast.[14]

The information gathered by the FBI, the FCC, and Naval Intelligence which minimized General DeWitt's theory of a mass threat gradually came to the Justice Department's attention as it prepared to defend these cases before the Supreme Court. Once in possession of these facts, Depart-

ment officials disagreed among themselves about whether disclosure was required. That issue was initially raised by Edward Ennis, Director of the Justice Department's Alien Enemy Control Unit, during preparation of the *Hirabayashi* brief. Ennis, who had learned of Lieutenant Ringle's intelligence work,[15] summarized Ringle's conclusions about the "Japanese Problem" in a memorandum to the Solicitor General. *See* Memorandum from Ennis to Solicitor General Charles Fahy (Apr. 30, 1943) (Complaint, Exhibit J). Ennis then noted that the government planned to argue in *Hirabayashi* that mass evacuation was required because individual, selective evacuation would have been "impractical and insufficient." But, he pointed out, this argument was significantly undercut by the fact that "the only Intelligence agency responsible for advising Gen. DeWitt gave him advice directly to the contrary." Memorandum at 3. Ennis suggested that the Department had a duty to disclose the report to the Court. "[A]ny other course of conduct might approximate the suppression of evidence." *Id.* at 4.

Despite Ennis' memorandum, the *Hirabayashi* brief did not mention Ringle's conclusions.[16] The government instead argued that its actions were reasonable based on the gravity of the military situation following Pearl Harbor, the danger of an attack on the West Coast, the potential for sabotage by an unknown number of disloyal Japanese Americans, and the inability to determine loyalty on short notice. As evidence of these conclusions, the government

---

**12.** A partial listing of cases involving legal claims or defenses raised by Japanese Americans is given in Plaintiffs' Supplemental Memorandum on the Statute of Limitations (Jan. 20, 1984) (Exhibit A).

**13.** A companion case, *Yasui v. United States*, 320 U.S. 115, 63 S.Ct. 1392, 87 L.Ed. 1793 (1943), was decided at the same time.

**14.** In a third case, *Ex parte Endo*, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243 (1944), the Court held that the WRA had no statutory authority to continue to detain concededly loyal citizens. The constitutional issue was not reached. A lengthy treatment of the legal strategies in these

wartime cases can be found in P. Irons, *Justice at War* (1983).

**15.** Ennis stated that he first learned of Ringle's views from an article by "An Intelligence Officer" in the October 1942 issue of Harper's Magazine. Ennis subsequently procured a copy of a report that Ringle had prepared for the WRA based upon Ringle's earlier intelligence work. Ennis Memorandum at 1.

**16.** The Harper's Magazine article was cited only for the proposition that Japanese Americans educated in Japan would probably be intensely loyal to that country. Brief for the United States at 29 & n. 46, *Hirabayashi.*

cited the historic animus toward the Japanese on the West Coast, the substantial portion of the Japanese American population comprised of aliens, the prevalence of dual citizenship among Japanese Americans, their practice of Shintoism, which includes among its beliefs the divinity of the Japanese emperor, the large number of American-born children of Japanese parents who were educated in Japan or in Japanese language schools on the West Coast, and the links between West Coast Japanese organizations and Japan. The government drew this evidence from facts—found in congressional hearings, newspaper reports, and general articles and books—that "embrace the general military, political, economic, and social conditions under which the challenged orders were issued. These historical facts ... are of the type that are traditionally susceptible of judicial notice in considering constitutional questions ...." Brief for the United States at 11, *Hirabayashi* (footnote omitted).[17]

The question of disclosure arose again in 1944 with the preparation of briefs for *Korematsu v. United States.* By this time, DeWitt's *Final Report* had been published.[18] Also, by this time, the Attorney General had in his possession the letters from FCC Chairman Fly and FBI Director Hoover contradicting the *Report*'s security concerns. *See* Letter from FCC Chairman Fly to Attorney General Biddle (Apr. 4, 1944) (Complaint, Exhibit E); Memorandum from John L. Burling to Attorney General Biddle (Apr. 12, 1944) (Complaint, Exhibit K). Prompted by these letters, two Justice Department officials working on the *Korematsu* brief—Ennis and Burling—pushed for the Department to disavow the *Final Report.* Memorandum from Ennis to Assistant Attorney General Herbert Wechsler (Sept. 30, 1944) (Complaint, Exhibit L).

Burling wrote a footnote, initially included within a draft of the brief, that stated:

The Final Report of General DeWitt (which is dated June 5, 1943, but which was not made public until January 1944) is relied on in this brief for statistics and other details concerning the actual evacuation and the events that took place subsequent thereto. The recital of the circumstances justifying the evacuation as a matter of military necessity, however, is in several respects, particularly with reference to the use of illegal radio transmitters and to shore-to-ship signalling by persons of Japanese ancestry, in conflict with information in the possession of the Department of Justice. In view of the contrariety of the reports on this matter we do not ask the Court to take judicial notice of the recital of those facts contained in the Report.

Memorandum of Burling to Assistant Attorney General Wechsler (Sept. 11, 1944) (quoted in *Korematsu v. United States*, 584 F.Supp. 1406 at 1417 (N.D.Cal. Apr. 19, 1984)). Ennis urged the footnote's preservation against War Department objections on several grounds, including the Justice Department's ethical obligation to the Supreme Court not to cite inaccurate material as a source of which the Court might take judicial notice. Ennis Memorandum at 1.

Instead, after negotiation with the War Department, the Justice Department substituted a different footnote, which was less offensive to the War Department and more ambiguous as to the accuracy of the *Final Report.* The new footnote stated that

The Final Report of General DeWitt (which is dated June 5, 1943, but which was not made public until January 1944), hereinafter cited as *Final Report,* is relied on in this brief for statistics and other details concerning the actual evacu-

---

**17.** The brief did not cite DeWitt's *Final Recommendation* as a source of its facts.

**18.** In 1942, an excerpt from the *Final Report* was shown to Ennis, who objected to misstatements of fact within it. Prior to its official publication, copies were made available to the states of California, Oregon, and Washington for use in an *amici curiae* brief in *Hirabayashi;* advance copies were not given to the Justice Department, however. *See* Memorandum from Ennis to Assistant Attorney General Herbert Wechsler at 3 (Sept. 30, 1944) (Complaint, Exhibit L).

ation and the events that took place subsequent thereto. We have specifically recited in this brief the facts relating to the justification for the evacuation, of which we ask the Court to take judicial notice, and we rely upon the *Final Report* only to the extent that it relates to such facts.

Brief for the United States at 11 n. 2, *Korematsu.* In place of the *Final Report,* the brief based its military necessity argument on the facts and authorities cited in the *Hirabayashi* brief. The brief added to these authorities Ringle's anonymous Harper's Magazine article. *Id.* at 12 n. 3. The brief did not discuss the article's contents.

With these representations before it, the Court upheld both the curfew in *Hirabayashi* and the evacuation in *Korematsu* as legitimate exercises of the constitutional power to wage war. Findings of military necessity were central to both of these holdings. As the Court stated in *Korematsu:*

> Here, as in the *Hirabayashi* case, *supra,* [320 U.S.] at page 99 [63 S.Ct. at page 1385], "... we cannot reject as unfounded the judgment of the military authorities and of Congress that there were disloyal members of that population, whose number and strength could not be precisely and quickly ascertained. We cannot say that the war-making branches of the Government did not have ground for believing that in a critical hour such persons could not readily be isolated and separately dealt with, and constituted a menace to the national defense and safety, which demanded that prompt and adequate measures be taken to guard against it."

323 U.S. at 218, 65 S.Ct. at 195.

## II.

Plaintiffs' complaint alleges the foregoing facts and, for relief, asks that the United States be required to pay compensation for various injuries caused to them by the internment. The United States defends by a plea of sovereign immunity and emphasizes that it is subject to suit for monetary damages only in those situations where it has consented to be sued. *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). Plaintiffs cite a number of statutes which they claim act to waive sovereign immunity: the Tucker Act, the Federal Tort Claims Act, the civil rights statutes, the general federal jurisdiction statute, and the Administrative Procedure Act. These statutes will be considered in that order. Where plaintiffs have established a waiver of sovereign immunity, the United States' other defenses—the running of the statutes of limitation and the exclusivity of the American-Japanese Evacuation Claims Act—will be considered.

### A.

The Tucker Act grants federal court jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491.[19] That language has been held to constitute consent by the federal government to suit for monetary damages. *United States v. Mitchell,* —— U.S. ——, 103 S.Ct. 2961, 2967, 77 L.Ed.2d 580 (1983). It does not, however, create a substantive right to damages. Rather, the substantive right must be found in some other source of law, such as the Constitution, an Act of Congress, or an executive regulation. Not every constitutional provision, statute, or regulation provides a basis for an award of monetary damages against the federal government. To succeed, the plaintiff must show that the source of substantive law "can fairly be interpreted as mandating compensation by the Federal Government for the dam-

---

**19.** Section 1491 grants jurisdiction over these cases to the United States Claims Court. The district courts are given concurrent jurisdiction by 28 U.S.C. § 1346(a)(2) for claims not exceeding $10,000. Plaintiffs seek only $10,000 for each nontort claim and therefore fall within § 1346(a)(2).

ages sustained." *Id.* 103 S.Ct. at 2968 (quoting *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976)); *see also Kizas v. Webster,* 707 F.2d 524, 537 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). Such a source of substantive law need not itself contain a waiver of sovereign immunity; the Tucker Act suffices for that purpose. *Mitchell,* 103 S.Ct. at 2968.

Fourteen of plaintiffs' claims are based on alleged violations by the federal government of plaintiffs' constitutional rights. Plaintiffs contend that they were subjected to loss of life, liberty, and property without probable cause, notice of charges against them, or hearings in violation of their Fifth Amendment due process rights (Count I); that they were subjected to invidious discrimination based on race and national origin in violation of their Fifth Amendment equal protection rights and of the privileges and immunities clause (Counts II, V); that their property was taken without just compensation in violation of the Fifth Amendment takings clause (Count III); that they were subjected to arrest and search without probable cause or warrant in violation of the Fourth Amendment (Count IV); that they were denied fair trial and representation by counsel in violation of the Sixth Amendment (Count VI); that they were subjected to cruel and unusual punishment in violation of the Eighth Amendment (Count VII); that they were deprived of their First and Ninth Amendment rights of freedom of speech, petition, assembly, religion, travel, and privacy (Counts VIII–XII); that they were subjected to forced labor without compensation in violation of the Thirteenth Amendment (Count XIII); that they were the subject of bills of attainder and *ex post facto* laws in violation of Article I, section 9 (Count XIV); and that they were denied their right of *habeas corpus* pursuant to Article I, section 9 (Count XV).

Only one of the constitutional provisions on which plaintiffs rely can fairly be interpreted to mandate compensation: the Fifth Amendment "takings" clause. The Fifth Amendment due process clause does not support a monetary claim against the federal government because "[t]he Due Process Clause simply cannot be read to mandate money damages be paid." *Radin v. United States,* 699 F.2d 681, 685 n. 8 (4th Cir.1983) (quoting *Alabama Hospital Ass'n v. United States,* 656 F.2d 606, 609, 228 Ct.Cl. 176 (1981)). Nor does the equal protection clause of the Fifth Amendment mandate compensation. *Carruth v. United States,* 627 F.2d 1068, 1081, 224 Ct.Cl. 422 (1980) (equal protection clause "do[es] not obligate the Federal Government to pay money damages"). The other constitutional provisions are equally inhospitable to plaintiffs' monetary claims.

 Plaintiffs urge the Court to follow either of two paths around this jurisdictional roadblock. First, they argue that the government should be equitably estopped from raising a sovereign immunity defense because of its alleged misconduct in misrepresenting and suppressing evidence before the courts and manipulating judicial processes. However, it is well established that subject matter jurisdiction cannot be created by the actions of the parties; in particular, principles of estoppel do not apply. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982).

 Plaintiffs alternatively urge that the rule of liability articulated in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), be extended against the federal government. In *Bivens,* the Supreme Court recognized the right of a private plaintiff to seek damages against a federal agent who, while acting under color of his authority, violated the plaintiff's Fourth Amendment rights. *See also Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (recognizing *Bivens* claim based on Eighth Amendment); *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (recognizing *Bivens* claim based on Fifth Amendment due process clause). Plaintiffs argue

that a *Bivens* action should lie not only against an individual federal employee but also against the United States itself. Plaintiffs point to principles underlying the Court's action in *Bivens*—the historic availability of damages to remedy invasions of personal interests in liberty and the absence of other effective judicial remedies—as support for their position. *Cf.* Note, *Rethinking Sovereign Immunity After Bivens*, 57 N.Y.U.L.Rev. 597 (1982). However, *Bivens* also cautions that a court should refrain from creating a cause of action where "special factors counsel[ ] hesitation in the absence of affirmative action by Congress." *Bivens*, 403 U.S. at 396, 91 S.Ct. at 2005. Congress' interest in maintaining control over the public fisc is such a special factor. Thus, there being no affirmative action by Congress in this context, the doctrine of sovereign immunity stands as a bar to the holding that plaintiffs seek. *See Duarte v. United States*, 532 F.2d 850, 852 (2d Cir.1976) (refusing to recognize *Bivens* action against United States).

■ Only the takings claim remains of plaintiffs' causes of action based on the Constitution. The takings clause forbids that "private property be taken for public use, without just compensation." *U.S. Const.* amend. V. That guarantee is designed "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Plaintiffs' claim is in essence an inverse condemnation proceeding, in which a citizen is deprived of property by the government and then must initiate judicial action to obtain just compensation. This Court has jurisdiction over such suits under the Tucker Act. *United States v. Dow*, 357 U.S. 17, 21, 78 S.Ct. 1039, 1044, 2 L.Ed.2d 1109 (1958); *United States v. Dickinson*, 331 U.S. 745, 747–48, 67 S.Ct. 1382, 1384, 91 L.Ed. 1789 (1947).

Plaintiffs' alleged property losses fall into three categories. The first category includes property confiscated by federal authorities: cameras, radios, vehicles, bank deposit assets, crops, and business property. The second category encompasses property lost as a result of the government's exclusion of plaintiffs from homes and businesses on the West Coast. The third consists of "vested constitutional rights" lost as a result of the evacuation and internment. Plaintiffs' Opposition to Motion to Dismiss at 14–16 (July 15, 1983).

■ The claim that the government "took" constitutional rights can be quickly dismissed. The Supreme Court has defined property for taking purposes as "the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it." *United States v. General Motors Corps.*, 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945). Contract rights are also a form of property that may be taken. *United States Trust Co. v. New Jersey*, 431 U.S. 1, 19 n. 16, 97 S.Ct. 1505, 1516 n. 16, 52 L.Ed.2d 92 (1977). The various constitutional rights asserted by plaintiffs, however, do not fall within any category of "property" recognized for takings purposes. The cases cited by plaintiffs, *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), and *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), define property rights for the purpose of due process but have no applicability to takings doctrine. *See Kizas v. Webster*, 707 F.2d 524, 539 (D.C.Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

■ Plaintiffs' other claims fit within the takings clause's definition of property. There is no "set formula," however, for determining whether their property was "taken." Rather, a court must engage in "essentially ad hoc, factual inquiries," and its ruling will depend largely "upon the particular circumstances [in that] case." *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). A number of factors guide this determination. One is the character of the governmental action; a taking may more readily be found

when there is an actual physical invasion of the property than when the interference took the form of a public program. Still, physical invasion is not essential; a statute that substantially furthers important public policies may still so frustrate distinct investment-backed expections as to amount to a taking. *See id.* at 123–28, 98 S.Ct. at 2658–61 (reviewing taking cases); *Foster v. United States,* 607 F.2d 943, 221 Ct.Cl. 412 (1979) (taking occurred when owners of reserved mineral interest in land they gave to government were denied access to property for mining purposes.)

 Defendant suggests that there is no takings claim here because the government's actions were based on a perceived need to protect the national security. During times of imminent peril, the government is empowered to destroy an individual's property without compensation where that action might result in saving the lives and property of many. *See United States v. Caltex,* 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952); *United States v. Pacific Railroad Co.,* 120 U.S. 227, 7 S.Ct. 490, 30 L.Ed. 634 (1887). Common examples of this authority would be the demolition of neighboring structures to fight a city fire, or, of more relevance to this case, the destruction of bridges or refineries to impede the advance of enemy forces. The sovereign is not free to take any property without compensation that may be needed for the war effort; the element of imminent peril is required.[20]

 The issues posed by plaintiffs' takings claim therefore, are whether a taking occurred and whether the taking, if any, was the product of action necessitated by immediate peril. Plaintiffs, of course, allege that there was no military necessity for the evacuation and internment and that

those in charge were aware of that fact. Considering plaintiffs' allegations of fact in the most favorable light, as required with a motion to dismiss, the Court must conclude that plaintiffs have stated a takings claim.

## B.

 Yet that conclusion does not end the inquiry. The government contends that this Court does not have jurisdiction to hear the takings claim, or, in fact, any of plaintiffs' claims, because Congress intended that the reimbursement mechanism created by the American-Japanese Evacuation Claims Act, 50 U.S.C.App. §§ 1981–1987, should be the exclusive remedy for monetary claims of those affected by the evacuation program.[21]

The Act was passed in 1948 for the purpose of adjudicating "claims of persons of Japanese ancestry against the United States for losses arising out of their forced evacuation from the west coast, Alaska, and Hawaii during World War II." H.R. Rep. No. 732, 80th Cong., 2d Sess., *reprinted in* 1948 *U.S.Code Cong. & Ad.News* 2297, 2297. Under the statute, which was amended in 1951 and 1956, the Attorney General was empowered to settle claims for up to $100,000 for damage to or loss of real or personal property that was a "reasonable and natural consequence" of the evacuation. 50 U.S.C.App. §§ 1981(a), 1984(a). If a compromise could not be reached, the Court of Claims had jurisdiction to determine the claim. *Id.* § 1984(b). Not compensable under the Act were losses resulting from death or personal injury, personal inconvenience, physical hardship, or mental suffering; loss of anticipated profits or earnings; loss of property vested in the United States pursuant to the Trading With the Enemy Act; and losses aris-

---

**20.** The cases cited by defendant to support its "national security" argument are inapposite here. Both *National Board of Young Men's Christian Associations v. United States,* 395 U.S. 85, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969), and *Monarch Insurance Co. v. District of Columbia,* 353 F.Supp. 1249 (D.D.C.1973), *aff'd,* 497 F.2d 683 (D.C.Cir.), *cert. denied,* 419 U.S. 1021, 95 S.Ct. 497, 42 L.Ed.2d 295 (1974), concern tak-

ings claims based on destruction that occurred in efforts to protect the property at issue.

**21.** Plaintiffs cite the Evacuation Claims Act as a jurisdictional basis for their suit. Complaint ¶ 8. All claims under the Act were required to be filed by January 3, 1950. 50 U.S.C.App. § 1982(a). Plaintiffs' claims, therefore, would fall outside the terms of the Act.

ing from certain statutory actions of government agencies. The Act also excluded claims by individuals deported to Japan or who were not actually residing in the United States on December 7, 1941. *Id.* § 1982(b). The Act set a deadline of January 3, 1950, for the presentation of claims. *Id.* § 1982(a). The payment of an award under the Act was "final and conclusive for all purposes, notwithstanding any other provision of law to the contrary" and was a "full discharge of the United States ... with respect to all claims arising out of the same subject matter." *Id.* § 1984(d). Over 26,000 claims were filed; approximately $37 million was distributed by the government. *Personal Justice Denied* at 118.

Defendant argues that the Act is a comprehensive system which Congress designed with claims similar to plaintiffs' in mind. Therefore, defendant asserts, the Court does not have subject matter jurisdiction over plaintiffs' claims; Congress placed that jurisdiction solely in the hands of the Attorney General and the Court of Claims.

Defendant reads too much into the Act. The intent of Congress, as expressed by the language of the statute, was to compensate "for damage to or loss of real and personal property," *id.* § 1981; the statute carefully excludes claims that are not directly related thereto. It may be true, as defendant states, that the Attorney General and the Court of Claims took a broad approach to defining compensable claims. But that is not evidence of Congress' intent. The Act does not bar this Court from jurisdiction over all of plaintiffs' claims.

Whether the Act was intended to be the sole remedy for claims of property loss is a more difficult question. Here, the Supreme Court's teachings in *Brown v. General Services Administration*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), are instructive. The question in *Brown* was whether Congress intended Title VII of the Civil Rights Act of 1964 to be the exclusive remedy for a federal employee complaining of job-related discrimination.

Congress failed to state the answer explicitly, so the Court looked to other evidence of Congress' intent. First, it noted that at the time Congress extended Title VII to federal workers, Congress believed, rightly or wrongly, that federal employees had no other remedy to fight employment discrimination. The Court found in that perception an indication of intent to create an exclusive remedy. In addition, the Court found that the "structure" of the Act was indicative of exclusivity: "The balance, completeness, and structural integrity of § 717 are inconsistent with the petitioner's contention that the judicial remedy afforded by § 717(c) was designed merely to supplement other putative judicial relief." *Id.* at 832, 96 S.Ct. at 1967. It has often been held that a precisely drawn, detailed statute preempts more general remedies.

■ Here, there is a detailed statute, finely tuned by amendment, and enacted by a Congress that may have believed that no other remedy was available to those who had been evacuated. *See* H.R.Rep. No. 732, 80th Cong., 2d Sess., *reprinted in* 1948 *U.S.Code Cong. & Ad.News*, 2297, 2299. ("The only clear recourse which the evacuees now have, through the passage of private relief bills, is totally impracticable.") (Letter from Interior Secretary J.A. Krug to House Speaker Joseph W. Martin, Jr.) Yet the system Congress created, while detailed, is not complete; it does not reimburse individuals for all property claims for which they might recover under the takings clause. For example, there has been no showing here that claimants were paid for the value of the use of property denied to them during the period of their internment. But such lost value is recoverable when a "temporary" taking occurs. *Compare* 50 U.S.C.App. § 1981 *with Kimball Laundry Co. v. United States*, 338 U.S. 1, 7, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765 (1949). Nor were claimants paid for interest that accrued between the time of their loss and the time of payment. Yet interest is also recoverable under the takings clause. *Compare Claim of George M. Kawaguchi*, 1 *Adjudications of the Attorney*

*General* 14, 19–20 (1956), *with Seaboard Air Line Railway Co. v. United States*, 261 U.S. 299, 306, 43 S.Ct. 354, 356, 67 L.Ed. 664 (1923). To bar constitutional claims from the courts is an extraordinary step which courts are not willing to take absent a clear and convincing expression of congressional intent. *See Johnson v. Robison*, 415 U.S. 361, 366–67, 94 S.Ct. 1160, 1165, 39 L.Ed.2d 389 (1974).

### C.

■ The question of exclusivity need not be reached here, however, because another defense raised by the government—the running of the statute of limitations—requires dismissal of the takings claim. The lifespan of plaintiffs' takings claim is controlled by 28 U.S.C. § 2401(a), which states that, except where specifically provided elsewhere,

> every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.

The Court has no jurisdiction to consider claims that fall outside the six-year period. *Japanese War Notes Claimants Association of the Philippines, Inc. v. United States*, 373 F.2d 356, 358, 178 Ct.Cl. 630, *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967); *see also Garrett v. United States*, 640 F.2d 24, 26 (6th Cir. 1981).

■ The length of a statute of limitations is a product of a legislative weighing of competing claims of fairness—the need of plaintiffs for a reasonable amount of time within which to present their claims, and the right of defendants to be free of stale claims. Statutes of limitation also protect both the Court and the defendant from cases where the loss of evidence—by death or disappearance of witnesses, fading memories, or disappearance

of documents—may frustrate the search for truth. *United States v. Kubrick*, 444 U.S. 111, 117, 100 S.Ct. 352, 356, 62 L.Ed.2d 259 (1979).

This suit was filed on March 16, 1983. A right of action normally accrues at the time the underlying incident occurred, and that in essence is the rule defendant wants applied here. The alleged taking of property occurred during World War II; under defendant's theory, the six-year period would have begun to run then and would have expired well before this suit was filed.

■ Plaintiffs assert, however, that defendant fraudulently concealed information essential to their cause of action. They claim that this information was not revealed until the publication in December 1982 of *Personal Justice Denied*, the report of the Commission on Wartime Relocation and Internment of Civilians. Plaintiffs argue that the running of the statute was tolled until that date, so that their suit would fall well within the six-year period.[22]

■ Plaintiffs' argument relies heavily on this Circuit's decision in *Richards v. Mileski*, 662 F.2d 65 (D.C.Cir.1981). The plaintiff Richards was a career employee with the United States Information Agency who resigned under duress in 1955. He brought suit 24 years later, complaining that defendants, six former federal officials, had knowingly and maliciously used false information to obtain his resignation. Defendants did not tell plaintiff in 1955 that they had concocted the charges that led to his resignation; plaintiff did not discover that fact until 1978, when a request under the Freedom of Information Act produced documents revealing defendants' culpability. Defendants' motion to dismiss on statute of limitations grounds was granted. The Court of Appeals reversed, holding that where a defendant conceals facts giv-

---

**22.** In addition, plaintiffs argue that the United States is equitably estopped from raising a statute of limitations defense because of its fraudulent concealment. The statute of limitations is a condition that Congress has placed on the United States' consent to suit. As such, it is a jurisdictional requirement that cannot be

waived or subject to estoppel. *Garrett v. United States*, 640 F.2d 24, 26 (6th Cir.1981); *see also Insurance Corp. of Ireland, Ltd. v. Compagnie Des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982) (subject matter jurisdiction cannot be established by estoppel).

ing rise to the plaintiff's claim—here that defendants had made false accusations against plaintiff—the statute is tolled until the plaintiff, employing due diligence, could have discovered the facts that were fraudulently concealed. *Id.* at 69–70.[23]

Plaintiffs do not argue that they were unaware during the war that they had lost their property or that the loss resulted from the government's program of evacuation and internment. Rather, they claim that had they brought suit when the property was lost, the suit would have foundered upon the government's defense that evacuation and internment were required by military necessity. Indeed, plaintiffs argue that the Supreme Court's "finding" of military necessity in *Korematsu* practically precluded any future challenge to the government's actions. The issue, therefore, under plaintiffs' theory of the case, is this: at what time were sufficient facts generally known about the evacuation and internment so that plaintiffs, using due diligence, could have conscientiously challenged the military necessity finding.[24] Plaintiffs maintain that sufficient information was not available until 1982 when the Commission pulled together the facts which allegedly impeach that finding.

The government urges adoption of a theory of accrual much narrower than the holding in *Richards*. It claims that *Richards* involved individual defendants, and that its fraudulent concealment holding does not necessarily apply to the United States. Instead, defendant argues, the most liberal tolling doctrine applicable to the United States is that set out in *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). In *Kubrick,* a medical malpractice suit brought under the Federal Tort Claims Act, the Supreme Court held that the Act's two-year statute of limitations begins to run once a plaintiff is aware of his injury and its cause. Awareness of his legal rights is not necessary. Defendant argues that the plaintiffs here knew of their injury—the property loss—and its cause when the injury occurred. Their cause of action therefore accrued then. Defendant contends that even if *Richards* should apply, there was no concealment of plaintiffs' "cause of action"; the concealment, if any, went to an affirmative defense and not to the takings claim.

Defendant is correct in stating that *Richards* involved individual defendants and not the federal government. But the doctrine of fraudulent concealment has been applied to the United States by other courts, and nothing in *Kubrick* establishes that those holdings are wrong. *See Diminnie v. United States,* 728 F.2d 301 at 305 (6th Cir.1984); *Japanese War Notes Claimants Association of the Philippines, Inc. v. United States,* 373 F.2d 356, 358–59, 178 Ct.Cl. 630, *cert. denied,* 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). Defendant is also correct in stating that the concealed facts in *Richards* went to an element of plaintiff's cause of action, while here, the concealed facts go to a defense. Yet it would not be appropriate to hinge the decision here on such a technical distinction.

It is undisputed that reports from the FCC, the FBI, and Naval Intelligence contradicting the claim of military necessity

**23.** Where there are continuing acts of concealment, plaintiffs urge adoption of a rule that accrual occurs, not when plaintiffs should have discovered their cause of action but, when they actually discovered it. *See Tomera v. Galt,* 511 F.2d 504, 510 (7th Cir.1975). Due diligence, not actual discovery, is the law of this Circuit, however.

**24.** It is helpful to view plaintiffs' argument in light of the recently revised Rule 11 of the Federal Rules of Civil Procedure. That rule states in part:

The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

were concealed by defendant throughout the war, as most graphically illustrated by the Ennis and Burling memoranda urging the disclosure of these findings in the *Hirabayashi* and *Korematsu* briefs. Obviously, Ennis and Burling strongly believed that these documents could have affected the Supreme Court's decisions. Had this information been suppressed until the present, plaintiffs' tolling argument might succeed under *Richards*.

But, even if *Richards* is applied in this case, plaintiffs' claim is time barred. The FCC, FBI, and Naval Intelligence reports and others have been available, and publicized, since soon after the war's conclusion. The pre-war report from Curtis Munson to President Roosevelt, which advised, "There is no Japanese 'problem' on the Coast" was first disclosed in 1946 during hearings of the Joint Congressional Committee on the Investigation of the Pearl Harbor Attack. *Pearl Harbor Attack: Hearings Before the Joint Committee on the Investigation of the Pearl Harbor Attack*, 79th Cong., 1st Sess. 2680 (1946). Ringle's detailed report, which concluded that only limited individual detention of Japanese Americans was needed, was published at least as early as 1949 in Martin Grodzins' book, *Americans Betrayed: Politics and the Japanese Evacuation* 188–89.[25] Grodzin's book also reported the letter from FCC Chairman Fly to Attorney General Biddle describing Fly's surveillance reports to General DeWitt and revealing the inaccuracies of DeWitt's claims of illicit transmissions. *Id.* at 291–94. That book notes that FBI Director Hoover similarly denied the existence of unauthorized transmissions in a letter to Biddle. *Id.* at 291. Finally, Grodzin points out that all of this information was gathered by the Justice Department in preparation for the Supreme Court litigation. *Id.* at 291 n. 50.

Grodzin's book is not alone; the events surrounding the evacuation and internment have been subjected to intense scrutiny over the years and have produced a lengthy literature.[26] These publications lay out almost all of the facts alleged by plaintiffs, along with many others. Plaintiffs cannot claim that the facts underlying their suit were discovered by the Commission on Wartime Relocation and Internment of Civilians. Its synthesis of the material has made it easier for plaintiffs to challenge the military necessity rationale of *Korematsu*. But the availability of the material to a diligent plaintiff did not require the Commission's intervention. A Supreme Court finding is a formidable obstacle. But diligent advocates have successfully challenged such decisions in the past. *Compare Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), *with Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896); *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), *with Swift v. Tyson*, 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842); *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), *with United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). Here, such a suit could have been filed long ago.

**25.** As noted above, an abbreviated version of Ringle's report appeared in the October 1942 issue of Harper's Magazine. The article did not carry Ringle's name; the author was listed as an "Intelligence Officer" stationed on the West Coast who had studied that area's Japanese population. Reference was made to the article in the government's *Korematsu* brief; the brief did not describe the article's conclusions or elaborate on the authority's identity or expertise.

**26.** An incomplete list of material, not including congressional hearings and archival material, published at least six years before this suit was filed would include *The Japanese in America, The Problem and Solution, Harper's Magazine*, Oct. 1942, at 489; U.S. Dept. of Interior, *The Evacuated People: A Quantitative Description* (1946); M. Grodzins, *Americans Betrayed* (1949); J. tenBroek, E. Barnhart & F. Matson, *Prejudice, War and the Constitution* (1954); A. Bosworth, *America's Concentration Camps* (1967); R. Daniels, *Concentration Camps USA: Japanese Americans and World War II* (1971); R. Daniels, *The Decision to Relocate the Japanese Americans* (1975); M. Weglyn, *Years of Infamy: The Untold Story of America's Concentration Camps* (1976). The most recent works are Commission on Wartime Relocation and Internment of Civilians, *Personal Justice Denied* (1982), and P. Irons, *Justice at War* (1983).

Still, plaintiffs point to several documents that were not released until the Commission's report was published in 1982 and that they claim are "essential" to the success of their challenge.

Two of these documents date from before the war: a memorandum from President Roosevelt to the Chief of Naval Operations, dated August 10, 1936 (Complaint, Exhibit B), and a memorandum from Secretary of the Navy Frank Knox to President Roosevelt, dated October 9, 1940 (Complaint, Exhibit A). These documents discuss the possibility of building "concentration camps" for Japanese Americans "in the event of trouble." Plaintiffs cite these as evidence that the conspiracy to deprive them of their constitutional rights began before the war. However, plaintiffs' suit is based not on the fact of internment but rather on internment without military necessity. These documents shed no new light on that, unless they corroborate military concerns contemporary to the internment decision.

Next, plaintiffs point to a letter from Colonel Karl Bendetsen, liaison between the War Department and the Western Defense Command, to Lieutenant John Hall, Acting Executive Officer in the Assistant Secretary of War's office. (Complaint, Exhibit M). The letter, dated September 13, 1942, submits to Hall a draft of legislation designed to suspend the writ of habeas corpus as to persons of Japanese ancestry who had been excluded from any military area. Plaintiffs view this as further evidence of the conspiracy to deprive them of their rights and property. But while his goal may not have been admirable, Colonel Bendetsen's suggestion of the submission of this or any other bill for Congress' consideration is not actionable or evidence of anything relevant to plaintiffs' ability to make a timely claim.

The most significant of the newly released documents are the memoranda by Edward Ennis and John Burling discussing the inaccuracies in DeWitt's *Final Report*

and urging that notice be taken of those inaccuracies in the *Hirabayashi* and *Korematsu* briefs. These memoranda show that some Justice Department officials believed that DeWitt's military necessity rationale was questionable but that their superiors decided nevertheless not to disclose to the Supreme Court probative evidence contradicting that rationale. Plaintiffs argue that these documents are essential to their claims because the

documents previously available did *not* disclose the government's conspiracy or other evidence obviously different from that which had been presented to the courts in the 1940's. To the contrary, this published information merely tended to support the *same arguments* advanced against the government and rejected in the wartime cases—that the plaintiff class was loyal to the United States and there was no military necessity for the wartime actions. It was not until the [Commission's] work and related archival findings uncovered and published evidence of *intentional government concealment and misrepresentation*, that plaintiffs had evidence *obviously different* from that earlier ruled on by the Supreme Court.... The [Commission] report and related archival findings repudiate the government's wartime representations in its legal briefs and the foundations of the Supreme Court's wartime rulings. These documents finally provided plaintiffs the grounds for a good faith pleading that could successfully rebut the government's claims of "military necessity," and thus meet the requirements of Rule 11, Fed.R.Civ.P., and *stare decisis.*

Plaintiffs' Supplemental Memorandum on the Statute of Limitations at 7–9 (Jan. 20, 1984) (footnote omitted).

However, it is the Ringle, Fly, and Hoover documents, not the Ennis and Burling memoranda, which contain the direct evidence requisite to challenging the finding of military necessity.[27] The Ennis and Bur-

---

**27.** The briefs filed in *Korematsu* by appellant, the Japanese American Citizens League, and the

American Civil Liberties Union all strongly attacked the finding of military necessity made by

ling memoranda are not probative of military necessity, *vel non*. They fully justify the condemnation of the wartime Department of Justice voiced by the Commission and the plaintiffs. The failure of the Attorney General or the Solicitor General of the time to be more forthright with the Supreme Court was one basis for the decision of the District Court in the Northern District of California to vacate the conviction of Fred Korematsu. *See Korematsu v. United States*, 584 F.Supp. 1406 (N.D. Cal.1984).[28] But for purposes of the takings claim at issue here, the memoranda are directly probative only of the fact that the Department of Justice denied the Supreme Court timely access to the Ringle, Fly, and Hoover documents.[29] That concealment, whether intentional or not, is not a basis for tolling a statute of limitations beyond the time the information concealed by that conduct was published. The publication in the late 1940's of the previously concealed Ringle, Fly, and Hoover documents, not the publication in the 1980's of the Ennis and Burling memoranda, provided the basis on which plaintiffs could have filed a complaint challenging the military necessity finding and marked the beginning of the running of the statute of limitations.

This conclusion does not overlook plaintiffs' contention that the 1982 publication of the Ennis/Burling memoranda was the first disclosure of direct evidence of a vital overt act in an alleged conspiracy: "intentional government concealment" of the Ringle, Fly, and Hoover documents from the Supreme Court by the Department of Justice at the behest of the military. *See* Plaintiffs' Supplemental Memorandum at 8. But there has long been sufficient circumstantial evidence of the concealment: the Department of Justice had these documents when it filed its brief in *Korematsu*, yet it is apparent from the face of the United States' brief that it did not mention those documents. *See supra* p. 788. Moreover, proof of intentional concealment or of conspiracy cannot overcome the ultimate fact for limitations tolling purposes that the underlying documents concealed from the Supreme Court in 1944 became public and were available to diligent plaintiffs from the late 1940's onward. The statute of limitations has run long ago.

■ In summary, the standard by which fraudulent concealment must be judged is not one of full disclosure but rather one of sufficient disclosure to allow the plaintiffs, through due diligence, to state a claim. In other words,

> Once the statute of limitations has been tolled, it is not necessary that plaintiff obtain a thorough understanding of all the facts to halt the suspension. Defendant is not required to wait until plaintiff

---

the Executive Branch. Those briefs, however, relied for factual assertions essentially upon newspaper reports and similar secondary sources.

**28.** Fred Korematsu recently brought a petition for a writ of error *coram nobis* in the United States District Court for the Northern District of California to vacate his wartime conviction on the ground of governmental misconduct. The Court has granted that petition. *Korematsu v. United States*, No. 27635–W (N.D.Cal. Nov. 14, 1983). In reaching its decision, the Court held, *inter alia*, that the petition had been timely filed.

> It appears from the record that much of the evidence upon which petitioner bases his motion was not discovered until recently. In fact, until the discovery of the documents relating to the government's brief before the Supreme Court, there was no specific evidence of governmental misconduct available.

*Id.*, at 1419.

That holding does not affect the conclusions of this Court. The government did not oppose Korematsu's *coram nobis* petition, so that the issue of timeliness was not sharply defined there. In contrast, this case involves the government's sovereign immunity, and thus requires a searching investigation of timeliness. Furthermore, while the "specific evidence" of governmental misconduct has only recently been revealed, circumstantial evidence has long been available. Finally, evidence of the government's misconduct was not requisite to the filing of plaintiffs' claims here; other evidence rebutting the government's claim of military necessity was available.

**29.** It is unclear whether the Department of Justice had the Munson report at the time it filed its briefs in *Korematsu*.

has started substantiating its claims by the discovery of evidence. Once plaintiff is on inquiry that it has a potential claim, the statute can start to run. *Japanese War Notes Claimants Association of the Philippines, Inc. v. United States*, 373 F.2d 356, 359, 178 Ct.Cl. 630, cert. denied, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). By this standard, plaintiffs could have brought their claim even without the benefit of these new documents.

In an attempt to reduce their burden, plaintiffs advance several arguments concerning the requirement of due diligence, each of which can be quickly met. They argue that "aggravating factors," such as "governmental secrecy, misrepresentations, exclusive control of evidence pertaining to military necessity, unidentified informants, and intentional efforts to conceal evidence," should be weighed in judging due diligence. Plaintiffs' Supplemental Memorandum on the Statute of Limitations at 15 (Jan. 20, 1984). But the due diligence standard was developed in the context of fraudulent concealment; to consider these "aggravating factors" would be the equivalent of double counting. Secondly, plaintiffs urge that the degree of difficulty in gathering the necessary documents—which they say were spread out over more than eighteen archival libraries in seven different states—should be considered in tolling the statute. The crucial time period in this regard, however, is not the time needed to assemble every relevant document, but the time needed to assemble information sufficient to file a complaint. As has been set out more fully above, all of the necessary facts have long been in the public domain, available to a diligent plaintiff and counsel.[30] Finally, plaintiffs argue that the due diligence requirement is lessened here because a fiduciary relationship existed between defendant and plaintiffs, putting an additional burden of disclosure on defendant. No such relationship can be established, however, as will be discussed below.

### D.

In addition to their constitutional claims, plaintiffs seek recovery under the Tucker Act on several contract theories (Count XXI).[31] They assert that express contracts, both oral and written, arose from promises by General DeWitt and other United States officials concerning the nature, purpose, and duration of the detention and the services and protections to be accorded plaintiffs. For example, Civilian Exclusion Order No. 5 (Complaint, Exhibit I) stated that the government would

Provide services with respect to the management, leasing, sale, storage or other disposition of most kinds of property including: real estate, business and professional equipment, buildings, household goods, boats, automobiles, livestock, etc.

Plaintiffs also allege the existence of implied in fact contracts based on defendant's "actions and directives assuming complete custody and care for plaintiffs and their property .... Plaintiffs correspondingly complied with government requests to abandon their homes, businesses, and properties, and sacrifice their freedoms." Plaintiffs' Opposition to Motion to Dismiss at 26 (July 15, 1983). Finally, plaintiffs allege express and implied contracts of bailment between plaintiffs and defendant for property seized by defendant or surrendered to its custody during the war, most of which has not been returned or accounted for.

In evaluating plaintiffs' claims, it must be kept in mind that the Tucker Act's waiver of sovereign immunity is limited to express contracts and contracts implied in fact; it does not extend to contracts implied in law or founded upon equitable principles. *Kizas v. Webster*, 707

---

**30.** The books cited *supra* note 26 are replete with relevant research.

**31.** The Tucker Act gives the Court of Claims "jurisdiction to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States ...." 28 U.S.C. § 1491. The district courts have concurrent jurisdiction for contract claims not exceeding $10,000. 28 U.S.C. § 1346(a)(2).

F.2d 524 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984); *Knight Newspapers, Inc. v. United States,* 395 F.2d 353, 357 (6th Cir.1968). In addition, contracts with the United States based on oral promises by a federal official are not valid absent proof that the official had the actual authority to make them. "One who purports to contract with the United States assumes the risk that the official with whom he deals is clothed with the actual authority to enter the contract alleged." *Jackson v. United States,* 573 F.2d 1189, 1197, 216 Ct.Cl. 25 (1978).

It is questionable whether the evacuation, which was authorized by military and executive order rather than mutual agreement, gave rise to any express or implied contracts. Yet even assuming that plaintiffs' contract claims are valid, those claims would be barred by the six-year statute of limitations that applies to contract claims under the Tucker Act. 28 U.S.C. § 2401(a). Plaintiffs allege that the government promised to protect their persons and property. Failure to do so would have been evident both during and after the war. The statute would have begun to run at that time.

 The statute of limitations would also bar plaintiffs' bailment claims, assuming those claims to be valid. Plaintiffs have not alleged when the government was expected to return the bailed goods. It would seem reasonable to conclude, however, that both parties expected demand for delivery to be made upon plaintiffs' release from internment. Yet even if there was no specified time of demand, plaintiffs cannot wait almost forty years to demand delivery. Where no time for demand is specified by contract, demand must be made within a reasonable time after the bailor is entitled to the return of the property. 8 C.J.S. *Bailment* § 45, at 497 (1962). That period would have expired soon after the war.

### E.

 Plaintiffs' final count under the Tucker Act alleges that defendant, through the evacuation and internment program, established a system of comprehensive and pervasive federal control over every aspect of plaintiffs' daily lives (Count XXII). According to plaintiffs, this system gave rise to a fiduciary relationship, with the United States as trustee and plaintiffs as wards or beneficiaries. The United States is alleged to have breached its fiduciary duties by failing to protect plaintiffs' property and civil liberties. Plaintiffs claim that the United States is liable for money damages for this breach.

Plaintiffs draw their fiduciary responsibility claim from the Supreme Court decision in *United States v. Mitchell,* —— U.S. ——, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). In that case, the Court found that a fiduciary relationship existed between the United States and certain Indian tribes with respect to management of Indian resources and land. The existence of that fiduciary relationship was held to give the Indians the right to seek money damages from the United States. The Court based its finding of a fiduciary relationship in part on the "elaborate" and "pervasive" control that the federal government exercised over Indian property through various statutes and regulations. 103 S.Ct. at 2972 & n. 29. The Court also pointed to precatory statutory and regulatory language directing the government to consider "the needs and best interests of the Indian owner and his heirs" and to dispose of proceeds from timber sales to the "benefit" of the Indian owners. The Court was also influenced by the "undisputed existence of a general trust relationship between the United States and the Indian people." *Id.* at 2972.

Plaintiffs analogize the "pervasive" control over their lives in the internment camps to that found in the *Mitchell* opinion and urge that a similar fiduciary relationship exists here. However, the comparison does not withstand close scrutiny. No act of Congress evidences an intent to create a fiduciary relationship between plaintiffs and defendant. No general trust relationship exists between plaintiffs and defendant. In fact, nothing here is analogous to the historic relationship between the United

States and the American Indians, created by treaty, judicial doctrine, and elaborate legislation. *See Cohen's Handbook of Federal Indian Law* 220–28 (R. Strickland ed. 1982).

### F.

█ In addition to basing jurisdiction on the Tucker Act, plaintiffs assert jurisdiction for almost all of their claims under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2401(b), 2671–2680. The FTCA allows individuals who are injured by federal government officials and employees in the course of their official duties to seek money damages from the United States. That waiver, however, is subject to numerous conditions. One condition placed on the waiver is that the district court shall not have jurisdiction unless the claim has first been presented and denied by the appropriate federal agency. 28 U.S.C. § 2675(a). Plaintiffs have filed no administrative claims here. They argue, however, that a variety of equitable and practical reasons dictate that they should not be required to exhaust their administrative remedies. Plaintiffs contend, for example, that filing would be impractical, given the size of the plaintiff class, and unnecessary, since the government already has full notice of plaintiffs' claims and an independent agency—the Commission—has recently investigated the incidents underlying the suit. They also claim an equitable exemption from filing where the government has concealed information pertinent to their claims. The line of cases plaintiffs cite to support an equitable exemption, however, applies only where the injured party did not know or have reason to know of the government's involvement in the tort. That is not the case here. More generally, the Court is bound to respect conditions placed by Congress on a waiver of sovereign immunity, particularly when those conditions are expressed in clear and forceful language. The filing requirement applies to all claims, including class actions. *See In re "Agent Orange" Product Liability Litigation,* 506 F.Supp. 757 (E.D.N.Y. 1980).[32]

Even if plaintiffs had exhausted their administrative remedies, their claims would be barred by the FTCA's two-year statute of limitations, 28 U.S.C. § 2401(b). Plaintiffs' FTCA claims can be classified into four groups: negligence, intentional law enforcement torts, constitutional violations sounding in tort, and civil rights claims. The FTCA waives sovereign immunity for claims accruing on and after January 1, 1945, a date which falls toward the end of the sequence of events underlying this suit. It will be assumed, without deciding, that all of plaintiffs' claims fall within the time period since the FTCA became effective.

Plaintiffs' negligence claim alleges that defendant failed to exercise reasonable care in its capacity as custodian of plaintiffs' person and property (Count XX). Because of defendant's negligence, plaintiffs allege, their property was lost or destroyed and they were poorly housed, fed, and cared for.[33] Any damage to plaintiffs' person or property caused by defendant's lack of due care would have been evident to plaintiffs at the time the injury occurred. If such a claim had been filed, and military necessity had been raised as a defense, plaintiffs have long had access to sufficient information to attempt to rebut that defense. These claims therefore would be time barred.

Plaintiffs state three counts that can be classified as intentional law enforcement torts. Count XVII alleges assault and battery, in that defendant's actions subjected plaintiffs to "numerous physical and psy-

**32.** Plaintiffs request in the alternative that this suit be stayed to allow them to exhaust their administrative remedies. Since the Court does not have jurisdiction of the FTCA claims, it cannot grant plaintiffs' request.

**33.** Plaintiffs also allege that defendant negligently failed "to pursue means within its control

for confirming plaintiffs' loyalty and securing plaintiffs' prompt release." Complaint, ¶ 132. It seems doubtful that defendant had a responsibility under tort law to secure plaintiffs' prompt release from internment. Even so, that claim would also be time barred.

chological injuries, fear of imminent bodily harm, and death." Count XVIII alleges false arrest and false imprisonment, in that the exclusion and internment was without legal authority or colorable legal claim. Count XIX alleges abuse of process and malicious prosecution.

Until 1974, the FTCA excluded claims arising out of intentional torts, including assault, battery, false imprisonment, false arrest, malicious prosecution, and abuse of process, from its waiver of sovereign immunity. In that year, Congress amended the FTCA to include these intentional torts when committed by federal "investigative or law enforcement officers." 28 U.S.C. § 2680(h). For plaintiffs' claims to succeed, therefore, they must "arise" after the 1974 amendment and have been committed by investigative or law enforcement officers as defined in the statute.

Plaintiffs assert that defendant's concealment of information prevented these claims from accruing until after 1974. But the facts that compel the conclusion that plaintiffs' other claims are time barred produce the same conclusion here. These causes of action are based on the premise that there was no military necessity for the exclusion, that officials in the military and government knew this to be so, but that they used military necessity as a pretext to achieve other goals. Plaintiffs could through due diligence have gathered sufficient information to assert these claims well before 1974.

Plaintiffs also allege that defendant conspired with its own officers and with state and local officials to deprive plaintiffs of their civil rights in violation of 42 U.S.C. §§ 1981, 1983, 1985, 1986 (Count XVI). The civil rights statutes create causes of action only against individuals and municipalities and do not themselves contain a waiver of sovereign immunity.[34] Plaintiffs contend, however, that civil rights claims, as well as tort claims based on the constitution, can be brought within the FTCA's waiver of immunity. A recent opinion of this Circuit, however, brings this argument into question.[35] Yet even if plaintiffs were correct, their claims would be time barred for the reasons stated above.

G.

 Plaintiffs allege several other jurisdictional bases, none of which are applicable here. The general federal question jurisdiction statute, 28 U.S.C. § 1331, does not waive sovereign immunity in actions essentially seeking money judgments from the United States. *Larsen v. Hoffman*, 444 F.Supp. 245, 255 (D.D.C.1977). The Administrative Procedure Act (APA), 5 U.S.C. § 702, effects a limited waiver of sovereign immunity in actions for specific relief such as injunctions or declaratory judgments. But plaintiffs can seek no such relief here. Also, the APA does not confer authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief sought. *Larsen*, 444 F.Supp. at 255. For both reasons, the APA is inapplicable here. Finally, there is no justiciable controversy here that would be appropriate for a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. The All

---

**34.** *United States v. Timmons*, 672 F.2d 1373, 1380 (11th Cir.1982) (§§ 1981, 1982 do not waive sovereign immunity); *Unimex, Inc. v. Department of Housing and Urban Development*, 594 F.2d 1060, 1061 (5th Cir.1979) (all sections); *Monarch Insurance Co. v. District of Columbia*, 353 F.Supp. 1249, 1252 (D.D.C.1973), *aff'd*, 497 F.2d 684 (D.C.Cir.), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 497, 42 L.Ed.2d 295 (1974) (§ 1983); *Community Brotherhood of Lynn, Inc. v. Lynn Redevelopment Authority*, 523 F.Supp. 779, 782–83 (D.Mass.1981) (§ 1986); *Hill v. McMartin*, 432 F.Supp. 99, 101 (E.D.Mich.1977) (§§ 1983, 1985, 1986).

**35.** This Circuit has stated that

> Because the FTCA's general waiver of immunity extends only to acts or omissions that would be tortious under state law, there is a question whether constitutional torts that do not also constitute torts under state law are cognizable under the FTCA.

*Gray v. Bell*, 712 F.2d 490 (D.C.Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984); *see also Birnbaum v. United States*, 588 F.2d 319 (2d Cir.1978) (constitutional violations are not actionable under the FTCA). Civil rights claims made under the FTCA would be subject to the same objection.

Writs Act, 28 U.S.C. § 1651, empowers the courts to issue writs necessary or appropriate "in aid of their respective jurisdictions" but does not provide jurisdiction in and of itself.

## CONCLUSION

For the above cited reasons, defendant's motion to dismiss must be granted. This ruling is not a fresh appraisal of the merits of the wartime decision, based on what now appears to be a questionable rationale of military necessity, to intern 120,000 citizens and residents because of their race.[36] It may be that timely claims on their behalf would have prevailed. But it is now close to forty years after the camps were closed, and almost that long after the facts essential to those claims were published. Much time has passed, memories have dimmed, and many of the actors have died.[37] These concerns are reflected in the statutes of limitation, and it is those statutes which present the ultimate bar to plaintiffs' claims.

In holding that plaintiffs' claims are time barred, the Court is mindful of this Circuit's warning that there is an "inherent problem in using a motion to dismiss for purposes of raising a statute of limitations defense." *Richards v. Mileski*, 662 F.2d 65, 73 (D.C.Cir.1981). Often, plaintiffs can find material issues of fact which require evidentiary hearings or at least a boiling down of factual disputes by a summary judgment process.

The granting of a motion to dismiss on limitations grounds is appropriate where, as here, the motion challenges the Court's subject matter jurisdiction on the basis of the pleadings and historical records. *See D.C. Transit System, Inc. v. United States, supra* note 4, at 1440 n. 1; *Capitol Industries-EMI, Inc. v. Bennett,* 681 F.2d 1107, 1118 (9th Cir.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed.2d 932 (1982).[38] The statute of limitations issue has been exhaustively briefed in the motion to dismiss, response, and reply and in supplemental briefs and replies requested by the Court. Oral argument was heard by the Court. The facts relevant to the motion are set out in the complaint, official documents filed with the complaint, *Personal Justice Denied,* and other historical writings publicized about the evacuation and internment.[39] There are no disputes about material facts relevant to the Court's conclusion.

Plaintiffs strenuously contend that those who suffered the evacuation and internment have not been adequately compensated. The Commission on Wartime Relocation and Internment of Civilians recommended that Congress create a $1.5 billion fund from which compensatory payments of $20,000 would be made to each present survivor of the evacuation and internment. The remainder would be used for public educational purposes and for the general welfare of the Japanese American community. Bills are now before Congress that would implement some or all of those recommendations.[40] The careful spadework

---

**36.** In 1976, President Gerald Ford formally repealed Executive Order No. 9066 and stated that the evacuation was one of our "national mistakes" and was "wrong." Proclamation 4417, 41 *Fed.Reg.* 7741 (Feb. 20, 1976).

**37.** For example, General DeWitt, a critical witness, died in 1962.

**38.** *See also* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1350, at 139–40 (Supp. 1984).

**39.** All of these sources may properly be considered by a court ruling on a motion to dismiss a complaint as time barred. *See* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1350, at 549–50 (1969).

**40.** *See, e.g.,* S. 2166, 98th Cong., 1st Sess. (1983); H.R. 4110, 98th Cong., 1st Sess. (1983); H.R. 3387, 98th Cong., 1st Sess. (1983); S. 1520, 98th Cong., 1st Sess. (1983).

In dealing with the American Indians, Congress encountered a similar situation, in which Indian tribes were denied a forum to bring treaty-based claims against the United States by the doctrine of sovereign immunity. Congress responded by creating the Indian Claims Commission. *See Cohen's Handbook of Federal Indian Law* 563–64 (R. Strickland ed. 1982). The American-Japanese Evacuation Claims Act was a step in this direction but was significantly limited in the scope of relief it granted.

which plaintiffs have done in the prosecution of their claims in court should contribute to making their argument to Congress more persuasive. And it may be that Congress will focus more closely on these claims once plaintiffs have exhausted their possible judicial remedies.